Terrell Kinyon DAVIS, Appellant,

v.

The STATE of Texas, Appellee.

No. 06–05–00001–CR.

Court of Appeals of Texas,
Texarkana.

Submitted Sept. 27, 2005.

Decided Nov. 21, 2005.

Chris Castanon, Mesquite, for appellant.

Steve Tittle, Asst. Dist. Atty., F. Duncan Thomas, Hunt County Dist. Atty., Greenville, for appellee.

Before MORRISS, C.J., ROSS and CARTER, JJ.

## OPINION

Opinion by Justice ROSS.

Terrell Kinyon Davis appeals from his convictions by a jury for five separate offenses arising from two transactions. All five cases were tried together, and the appeals are brought on a single record. The appeals in our cause numbers 06–05–00001–CR and 06–05–00002–CR are from Davis' convictions for aggravated kidnapping and aggravated robbery, respectively, alleged to have been committed during the first transaction. The remaining three appeals are from Davis' convictions for offenses alleged to have been committed during the second transaction: aggravated assault with a deadly weapon in each of the causes numbered 06–05–00003–CR and 06–05–00004–CR, and felon in possession of a firearm in cause number 06–05–00005–CR. Each of the five indictments alleged one prior felony conviction for enhancement purposes. Davis pled not guilty to each indictment, and pursuant to his election, the trial court assessed punishment in each case. The court sentenced Davis to forty-five years' imprisonment in each of the first four cases and twenty years' imprisonment in the fifth case. The jury made an express finding in each of the first four cases "that a deadly weapon, to wit: a firearm, was used or exhibited in the commission of the offense . . . or the immediate flight therefrom." The trial court made a similar deadly weapon finding in the fifth case. The punishments in all five cases run concurrently. Each appeal is disposed by a separate opinion issued of even date.

In the present appeal, Davis was convicted for the aggravated kidnapping of Thera Phelps. In the companion to this appeal (06–05–00002–CR), he was convicted of aggravated robbery of the same person. Davis contends that the trial court erred by denying his motion to suppress evidence of his identification as the actor and that the evidence of his identity is legally and factually insufficient to support the verdict. The same issues are raised in the companion case in which he was also convicted of aggravated robbery.

Because all five cases were tried together and the evidence concerning both transactions was presented to the same jury, we summarize that evidence before addressing Davis' contentions of error.

## THE FIRST TRANSACTION

(Aggravated Kidnapping and Aggravated Robbery)

The kidnapping and robbery occurred June 15, 2003, at about 12:30 a.m. The evidence shows that a man dressed in all black clothing, including a mask, accosted Thera Phelps, a Burger King employee, after she had closed the business and gone home. As she was getting out of her car, this person dressed in black appeared, held Phelps at gunpoint, got into her car, and ordered her to return to the store for the money. On arrival at the store, he ordered Phelps to turn off the alarm, open the safe, and give him the money, which she did. The two re-entered Phelps' car and she drove, at his directions, to a particular location not far from her home, where he got out of the car and ran away. The encounter lasted fifteen to twenty minutes. Phelps testified she could not identify her assailant, not even his racial group, from his appearance.

After Davis was arrested three months later, officers recorded his voice and played the recording for Phelps without comment or explanation. Detective Warren Mitchell testified that, without any hesitation or doubt, Phelps identified the voice as belonging to the person who had kidnapped her and robbed her business. Phelps testified at trial she had no doubt the voice on the recording was that of her assailant.

## THE SECOND TRANSACTION

(Aggravated Assaults and Unlawful Possession of a Firearm by a Felon)

The aggravated assaults occurred September 15, 2003, at about 12:50 a.m. The evidence shows that a man dressed in all black clothing, including a black ski mask and black gloves, and carrying a gun, accosted Tevas Jackson, a Church's Chicken store manager, after she had closed the business and gone home. He met Tevas[1] at her car and ordered her back in. She declined and screamed. He hit her with the gun while she continued to scream. Her daughter, LaKendra Jackson, came out of the house and also saw the assailant. At that point, the assailant pointed the gun at LaKendra and either told her "shut up" or "don't move." LaKendra retreated inside the house, and the assailant ran away.

Two officers, who were already responding to a different call in the immediate area, heard Tevas screaming and reached her immediately after the assault. Two other officers arrived promptly, and they all set up a perimeter around the immediate area and began searching for the assailant. Officer Adrian Guzman heard a car alarm activate in a carport located in close proximity, and he saw a person, dressed in all black clothing, running in front of the car parked in the carport. Guzman gave chase and caught the person,

who was immediately identified by a fellow officer—and who was identified in court by Guzman—as Davis. Davis had gloves and a black shirt in his hand that he dropped to the ground when Guzman caught him. Officers searched the carport where the car alarm activated and found a loaded pistol tucked behind a refrigerator on top of its motor. Guzman testified that the persons who lived at the residence told him the weapon did not belong to them.

## BOTH TRANSACTIONS

The evidence shows that, when Davis got out of Phelps' car to run away following his abduction and robbery of her, he was within only a few yards of the place where he was caught by Guzman after his assaults on Tevas and her daughter. Phelps and Tevas lived within a block of each other, and the record indicates Davis lived near both of them.

## VOICE IDENTIFICATION

Davis' points of error focus exclusively on the evidence identifying him as the actor in this prosecution. He first contends the court erred by denying his motion to suppress Phelps' identification of his voice. Davis casts his argument as an identification issue, seeking to have it analyzed in the same way as a photographic lineup, complaining about the procedure followed by the police in playing a tape for Phelps with only his voice on it. The State has not addressed the issue as presented, but treats the admissibility of the identification as any other piece of evidence.

The authorities controlling an identification analysis typically involve photographic lineups, occasionally with a vocal component—as in requiring the members of the lineup to repeat some key phrase. There is no Fifth Amendment question raised in this case, and counsel has correctly acknowledged that a defendant may be re-

---

1. First names are used to distinguish between persons with the same surname.

quired to speak words uttered by a robber as part of the identification process.[2]

Davis contends the pretrial identification procedure was so tainted as to make the identification unreliable, and thus the court should not have admitted the evidence. He argues that the procedure and resulting identification were unreliable because the victim was not able to describe and give characteristics of the voice at trial, because it was over three months between the attack and the time she heard the audiotape, and because no other voices were presented to her in a type of vocal lineup. Based on these grounds, Davis asks us to conclude that, because the pretrial identification was impermissibly suggestive, it should have been suppressed.

■ The general rule is that the Due Process Clause of the Fourteenth Amendment prohibits the use of identification testimony from a witness who was subjected to an impermissibly suggestive pretrial identification procedure. *Stovall v. Denno*, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967). The reason for the rule is the substantial likelihood of misidentification that suggestive procedures may engender. *Webb v. State*, 760 S.W.2d 263, 269 (Tex. Crim.App.1988); *Roberts v. State*, 923 S.W.2d 141, 144 (Tex.App.-Texarkana 1996, pet. ref'd). If the totality of the circumstances reveals no substantial likelihood of misidentification, even though the procedure was impermissibly suggestive, the court will consider the identification testimony reliable. Reliability is the linchpin in determining the identification testimony's admissibility. *Webb*, 760 S.W.2d at 269; *Roberts*, 923 S.W.2d at 144.

■ Further, the analysis requires an examination of the totality of the circumstances surrounding the identification. *Barley v. State*, 906 S.W.2d 27, 33–34 (Tex. Crim.App.1995). Suggestiveness may arise from the manner in which a pretrial identification procedure is conducted. *Id.* For example, a police officer may point out the suspect or suggest that a suspect is included in a lineup or photographic array. *Id.* Also, the content of a lineup or photographic array itself may be suggestive if the suspect is the only individual who closely resembles the description given by the witness. *Id.* Also, an individual procedure may be suggestive or the cumulative effect of procedures may be suggestive. *Id.; Page v. State*, 125 S.W.3d 640, 647 (Tex.App.-Houston [1st Dist.] 2003, pet. ref'd).

Although (as mentioned above) there are a number of cases involving both visual and vocal identifications of a defendant, counsel has directed us to no specific authority discussing this situation—where only a vocal identification is made—and we are aware of none. Because the sole purpose of the use of the tape recording of Davis' voice was the same as a photograph of Davis would have been had Phelps been able to attempt identification from appearance, we will apply the same types of strictures as are used in the more typical situation.[3]

■ Initially, we recognize that a single photograph "lineup" is considered improperly suggestive and is to be viewed with suspicion. *Manson v. Brathwaite*, 432 U.S. 98, 109, 117, 97 S.Ct. 2243, 53

---

2. See *Williams v. State*, 116 S.W.3d 788, 792 (Tex.Crim.App.2003) (a voice or handwriting exemplar is an identifying physical characteristic, not testimony, and therefore outside Fifth Amendment's protection).

3. See generally *Kellensworth v. State*, 278 Ark. 261, 644 S.W.2d 933, 934–35 (1983) (discussion of voice identification by aural lineup in conjunction with failed visual lineup where victim was unable to identify by sight, having been blindfolded during attack).

L.Ed.2d 140 (1977); *Delk v. State*, 855 S.W.2d 700, 706 (Tex.Crim.App.1993). A suggestive identification scenario, such as a single photograph lineup, is disapproved because the suggestive lineup increases the likelihood of misidentification. *Neil v. Biggers*, 409 U.S. 188, 199, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). A two-step analysis is used to determine the admissibility of an in-court identification. First, the photographic display cannot be impermissibly suggestive. Second, based on the totality of the circumstances, the suggestive display cannot give rise to a "substantial likelihood of irreparable misidentification." *Delk*, 855 S.W.2d at 706; *see Simmons v. United States*, 390 U.S. 377, 384, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968). The core issue is "whether under the 'totality of the circumstances' the identification was reliable even though the confrontation procedure was suggestive." *Neil*, 409 U.S. at 200, 93 S.Ct. 375.

■ Although we recognize that analysis of an identification of a voice differs from that of an identification by sight, the standards used to validate a visual identification provide considerable guidance. In evaluating the likelihood of misidentification caused by the corrupting effect of any suggestive identification procedure, we are to consider (1) the witness' opportunity to view the assailant at the time of the crime; (2) how much attention the witness was paying to the assailant; (3) the accuracy of the witness' description of the assailant; (4) the level of certainty the witness demonstrated at the confrontation; and (5) the time between the crime and the confrontation.[4] *Webb*, 760 S.W.2d at 269; *see Neil*, 409 U.S. at 199–200, 93 S.Ct. 375; *Johni-*

*gan v. State*, 69 S.W.3d 749, 752 (Tex.App.-Tyler 2002, pet. ref'd). Although not preferred, single person identification lineups have been held constitutionally admissible. *Neil*, 409 U.S. at 195, 93 S.Ct. 375.[5]

In this case, Phelps was in the immediate presence of her assailant for approximately fifteen to twenty minutes. She testified that she heard him speak quite a bit while giving her instructions and that he was immediately beside her the entire time. Because the victim had ample opportunity to hear the assailant and because her attention was focused on him during the encounter, the first two considerations are satisfied.

The third factor, the accuracy of the prior description of the voice of her assailant, fails completely. Phelps had provided the police with no prior description of Davis' voice and, at the pretrial suppression hearing, was unable to articulate any particular identifiable factors concerning his voice.

In the fourth consideration, the evidence shows that, when Phelps heard the voice, she exhibited a high level of certainty the voice she heard was that of her assailant. The officer who had played the audiotaped conversation for Phelps testified that, when he played the tape:

A. She listened, looking at me. She looked down, she—her hands began to shake, she tried to speak but her voice was just—she couldn't talk. Tears come [sic] from her eyes, ran down her cheeks. And I asked her what was wrong. She said, that's him. And I

---

4. In *Neil*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401, the Court listed these five nonexclusive factors to assess reliability.

5. In *Neil*, the Court upheld a conviction where the police, who had shown the victim numerous photographs of possible suspects, apprehended the accused, and, unable to find similar persons with whom to construct a lineup, took only the accused to the victim, who identified him as the rapist.

asked, that's who? She said, that's the guy that made me go back to the store.

Q. Did she seem uncertain at all?

A. No.

Q. And you'd call it a very strong emotional reaction she had to the sound of his voice?

A. Probably the strongest I've seen.

At trial, Phelps was emphatic both on direct and cross-examination that she had immediately recognized the voice on the tape as that of her assailant and that she was certain it was the same voice.

The final factor, the length of time that had elapsed, is weaker. Three months had elapsed between the date of the kidnapping and robbery and the date when Phelps heard the audiotape. There had been some time for her memory to fade. Her testimony, and that of the officer, about Phelps' instantaneous recognition of the voice, however, was absolutely unequivocal.

We also note that, in this instance, the officer carefully did not tell Phelps what recording he was playing for her, or why. He testified, as did she, that she was unaware of the possibility that she might hear the voice of the kidnapper, and that her reaction was immediate and powerful. This is a consideration that would not easily arise in a case involving a photograph, simply because of the nature of the media. The recording itself was not part of an interrogation and was of a casual conversation between the officer and Davis; thus, it would not have provided any hint of its purpose.

It can be argued Phelps might assume the reason she was asked to come to the police station was because the police had some lead in connection with her abduction and robbery, but in light of the officer's reticence, it does not necessarily follow that Phelps was expecting to hear the voice of her assailant on the audiotape. This differs from the more typical situation where an officer hands a photograph to a victim combined with a query as to whether it was a photograph of the actor.[6]

■■ The standard of review requires a reviewing court to consider the factors, which are all issues of historical fact, deferentially in a light favorable to the trial court's ruling. "The factors, viewed in this light, should then be weighed *de novo* against 'the corrupting effect' of the suggestive pretrial identification procedure." *Loserth v. State*, 963 S.W.2d 770, 773–74 (Tex.Crim.App.1998). The reviewing court must view the historical facts in a light most favorable to the court's ruling if the trial court does not make express findings of historical facts. *Id.* at 774. The trial court did not make any express findings of historical facts, so we view the historical facts in a light most favorable to the court's ruling.

A defendant bears the burden of establishing by clear and convincing evidence that the pretrial identification procedure was impermissibly suggestive. *Barley*, 906 S.W.2d at 33–34. The analysis requires an examination of the totality of the circumstances surrounding the identification. *Id.* at 33; *Mayfield v. State*, 152 S.W.3d 829, 832 (Tex.App.-Texarkana 2005, pet. ref'd); *Morrow v. State*, 139 S.W.3d 736, 741 (Tex.App.-Texarkana 2004, no pet.).

Although we believe the better practice would be to provide several similar voices in the identification procedure, considering the totality of the circumstances in the

---

**6.** Even had Phelps clearly realized that a voice on the tape was that of a suspect, such knowledge alone does not create a tainted identification. *See Clay v. State*, 518 S.W.2d 550, 554 (Tex.Crim.App.1975).

light most favorable to the court's determination, we do not find the procedure followed here to be impermissibly suggestive.[7] We also note there were actually two voices on the recording (Davis and the police officer), neither of which was identified to Phelps before the tape was played. We cannot say, based on the standard set out above, the court's determination that the procedure was not impermissibly suggestive was reversible error. The contention of error is overruled.

## LEGAL AND FACTUAL SUFFICIENCY

■■■■ Davis also contends the evidence is legally and factually insufficient to support the verdict. In reviewing the legal sufficiency of the evidence, we view the relevant evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Johnson v. State*, 23 S.W.3d 1, 7 (Tex.Crim.App.2000). In reviewing the factual sufficiency of the evidence, we are required to determine whether, considering all the evidence in a neutral light, the jury was rationally justified in finding guilt beyond a reasonable doubt. *Zuniga v. State*, 144 S.W.3d 477, 484 (Tex.Crim.App.2004).

Davis contends the evidence is insufficient because his identity was proven only by Phelps' testimony that she recognized his voice. The weight of that testimony, however, was for the jury to assess. There are cases holding that identifications by voice are sufficient to support a verdict. *Locke v. State*, 453 S.W.2d 484, 485 (Tex. Crim.App.1970); *see McInturf v. State*, 544 S.W.2d 417, 419 (Tex.Crim.App.1976). Further, in this case, the evidence of the second transaction, in light of the identical methods used, dates of the month, times of

the night, clothing worn, proximity of the victims to each other and to the defendant's residence, provide some evidence to support the verdict.

■■■■ Both transactions were prosecuted in the same trial. Evidence of both transactions was admitted without objection. The State offered the evidence of the assaults in the second transaction to prove identity based on a similar modus operandi. For such evidence to be admissible, identity must be an issue in the case. *Johnson v. State*, 68 S.W.3d 644, 650–51 (Tex.Crim.App.2002). When an extraneous offense is offered to prove identity, the common characteristics or the device used in each offense must be so unusual and distinctive as to be like a "signature." *Collazo v. State*, 623 S.W.2d 647, 648 (Tex. Crim.App. [Panel Op.] 1981). Signature features must consist of more than mere repeated commissions of the same class of crimes such as burglaries or robberies. *Owens v. State*, 827 S.W.2d 911, 915 (Tex. Crim.App.1992); *Pena v. State*, 867 S.W.2d 97, 99 (Tex.App.-Corpus Christi 1993, pet. ref'd). In this case, as previously set out, the modus operandi was identical, down to the time of night of the attacks, the location of both attacks were within a block of each other, and even the clothing worn was precisely the same type in both instances. Thus, the evidence was relevant and could be admitted because the sufficiently distinctive common characteristics between the extraneous offense and the charged offense earmarked both as the accused's handiwork. *Owens*, 827 S.W.2d at 914–15.

The evidence is probative on the issue of identity, which was the key issue in the prosecution based on the first transaction. *See Taylor v. State*, 920 S.W.2d 319, 322 (Tex.Crim.App.1996) (relying in part on

---

7. *See generally Clarke v. State*, 813 S.W.2d 654, 657 (Tex.App.-Fort Worth 1991), *aff'd,* 839 S.W.2d 92 (Tex.Crim.App.1992) (involving a voice lineup).

evidence that defendant had committed a near-identical earlier crime as evidence of identity); *Bryant v. State*, 656 S.W.2d 513, 517 (Tex.App.-Beaumont 1983, pet. ref'd) (relying on distinctive modus operandi of rapist in other attacks as evidence of identity). Based on this evidence, and on the identification by the victim of the voice of her assailant, and the complete lack of evidence to the contrary, we conclude the evidence is both legally and factually sufficient to support the verdict.

## DEADLY WEAPON FINDING

■ Davis also contends the evidence is insufficient to support the jury's deadly weapon findings in its verdicts finding him guilty of aggravated kidnapping, aggravated robbery, and the two aggravated assaults. He does not challenge the deadly weapon finding made by the trial court in its judgment in the felon in possession of a firearm case.

Davis challenges the deadly weapon finding in the first four cases because no weapon was recovered and there was no specific evidence provided to the jury adequately describing the type of weapon. Davis focuses on the lack of any evidence that the gun was actually a firearm (or if it was a toy or air pistol), and if it was a firearm, whether it was loaded or capable of being fired.

The allegation in this case was that a firearm was used. By definition, that is a deadly weapon. TEX. PEN.CODE ANN. § 1.07(17) (Vernon Supp.2005). The only information about the item is found in Phelps' testimony. In connection with the gun, she testified that, when she started to get out of her car at home, the gun was "just right there" and that she was fixated on it from that point. She testified that the gun was pointed at her and that she was afraid she was going to die that night. No further questions were asked. She was not asked to identify the type of weapon, and the record contains no other relevant evidence on that point.

■ In summary, we have evidence before us that the victim believed the item was a gun and that she feared for her life. This case was tried on the theory that a firearm was used in the crime. When the State alleges and proves that a weapon falls within this category, it is not necessary to verify that the object was really capable of causing death. *Thomas v. State*, 821 S.W.2d 616, 620 (Tex.Crim.App. 1991); *see also Grant v. State*, 33 S.W.3d 875, 881 (Tex.App.-Houston [14th Dist.] 2000, pet. ref'd) (no requirement that firearm be loaded to support deadly weapon finding).

We recognize that the term "gun" may be a much broader term than "firearm" when taken out of context and may include such nonlethal instruments as BB guns, blow guns, pop guns, and grease guns. *See O'Briant v. State*, 556 S.W.2d 333, 335–36 (Tex.Crim.App.1977). Courts have also recognized, however, that the factfinder may draw reasonable inferences and make reasonable deductions from the evidence as presented to it within the context of the crime. *See Goodin v. State*, 750 S.W.2d 857, 859 (Tex.App.-Corpus Christi 1988, pet. ref'd). Absent any specific indication to the contrary at trial, the jury may make the reasonable inference, from the victim's testimony, that a "gun" was used in the commission of a crime and that the gun was a firearm. *See Wright v. State*, 591 S.W.2d 458 (Tex.Crim.App. [Panel Op.] 1979); *Joseph v. State*, 681 S.W.2d 738, 739 (Tex.App.-Houston [14th Dist.] 1984, no pet.). Davis' threats against Phelps with the gun suggest it was a firearm rather than merely a gun of the nonlethal variety. *See Edwards v. State*, 10 S.W.3d 699, 701 (Tex.App.-Houston [14th Dist.] 1999), *pet. ref'd, improvidently granted*, 67 S.W.3d 228 (Tex.Crim.App.2002); *Benavides v.*

*State,* 763 S.W.2d 587, 589 (Tex.App.-Corpus Christi 1988, pet. ref'd).

Further, the evidence that Davis committed the assaults in the second transaction, and that he did so with a firearm, provides support for the inference that the device he carried during his kidnapping and robbery of Phelps was also a firearm.

Applying the evidentiary review standards set out above, we also find there is legally and factually sufficient evidence to allow the jury to conclude Davis used a firearm in the commission of these crimes, and there is nothing beyond supposition or guesswork to suggest the contrary.

## CONCLUSION

In summary, we hold that no error has been shown in the trial court's failure to suppress Phelps' identification of Davis' voice, that the evidence of his identification is legally and factually sufficient, and that the evidence supporting the jury's deadly weapon findings is sufficient.

Accordingly, we affirm the judgment.