# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-06-00332-CR

**Mario Menchaca, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF LAMPASAS COUNTY, 27TH JUDICIAL DISTRICT NO. 7825, HONORABLE WILLIAM BACHUS JR., JUDGE RETIRED

## M E M O R A N D U M   O P I N I O N

After a jury trial, Mario Menchaca was found guilty of aggravated assault with a deadly weapon. *See* Tex. Penal Code Ann. § 22.02(a)(2) (West Supp. 2006). In accordance with an agreement of the parties, the court sentenced him to eighteen years' imprisonment in the Texas Department of Criminal Justice-Institutional Division. In two issues on appeal, appellant contends that the evidence is legally and factually insufficient to prove that he exhibited a deadly weapon while threatening the complainant with serious bodily injury and that the trial court erred in failing sua sponte to instruct the jury that before it could consider extraneous offense evidence it must find that the State had proved those offenses beyond a reasonable doubt. We affirm the trial court's judgment.

**Background**

Although appellant's first issue challenges only the sufficiency of the evidence to support the finding that he exhibited a deadly weapon, some of the evidence supporting that finding is based on the complainant's testimony. In general, appellant attempted to minimize the severity of the events that resulted in the charges against him and vigorously attacks complainant's credibility. Accordingly, in order to provide sufficient context to evaluate the evidence, we have detailed the facts extensively.

On January 10, 2006, the night of the assault, Kathy Hughes, the complainant, was living with her grandmother. Hughes had been dating appellant for about five months; he sometimes stayed with them. He and Hughes planned to move to San Antonio together in the near future. Hughes said that she and appellant had a good relationship with no signs of trouble until a few nights before the assault. They were having an argument when he put his hand over her mouth forcefully enough to scare her. She "wanted the relationship to work," however, so she overlooked this event, but she said she had been in a "bad situation" before and had a bad feeling.

At the time of the assault, she said she was working for a woman named Theresa Bearden, doing house cleaning and other chores. She had just finished work when appellant called her and said that he had some news for her. Hughes said she thought the news was that appellant "[got] his parole papers" so that they could move to San Antonio. After she returned home, he wanted to leave immediately. Hughes said that she started feeling like something was wrong. Shortly after they left, she noticed an angry look on his face and asked if something was wrong. Although he said nothing was wrong, as soon as they stopped at a stop sign he had a beer and asked

2

her, "[W]hy did [you] get in a truck." Hughes testified that she sensed something "seriously wrong" with him so she "went to jump out of the car." She started to run; he caught her, slammed her back into the car, pushed her into the floorboard, locked the inside locks and said that she was going to take him "where she went" this afternoon.

Next, he demanded that she show him where Emmett Pugh and his wife lived. Emmett was a family friend who she had visited that day. They went to the Pughs' house where appellant verified that she had visited the Pughs that day. He then told the Pughs that Hughes should not have left her grandmother alone in order to visit them. Appellant and Hughes left after a few minutes. As they were pulling away from a gate across the drive leading away from the house, appellant pulled a gun out from under the seat, which Hughes said she had never seen before. She did not know anything about handguns and thought this one was real. He pointed the gun at her, said, "I'm not playing now," and put the gun to her head. He then pulled off to the side of the road, got out of the car, made her get out of the car, and then pulled her away from the road. During this entire time, he held a gun to her head and said that he was "going to blow [her] head off." Hughes said that "at this point, I had already messed my pants. I was already that scared." She felt like she was going to die.

She asked if she could finish going to the bathroom. When she was through, she was crying. He put the gun in her mouth and kept saying that she was doing drugs. He accused her of going into town to buy drugs. Although Hughes had admitted, and appellant knew about, Hughes's use of alcohol and prescription painkillers, she denied ever using other drugs. She said his eyes were bloodshot and he was furious. He took the gun out of her mouth and again said that he was going

3

to blow her head off.  He told her he could kill her and then call his brothers.  They would put her in a body bag, and he would tell her grandmother that he had dropped her off at a friend's house.  "They" would never find him, and even so, "it wouldn't hurt him to go back to prison."  The gun stayed pointed at her head except when he walked around for a minute.

He kept accusing her of doing drugs.  He kept saying that he knew from whom she was getting her pills.  Next, he made her call Theresa Bearden and her husband Jimmy.  He told Hughes to tell Jimmy that Theresa had been giving her pills and that she could not work for Theresa anymore.  The call ended.  He started calling her a liar, told her to get undressed, and told her that he was going to make her walk home.  It was around 9 or 9:30 at night and cold.  He opened the trunk.  She said she was afraid that he was going to stuff her in the trunk.  She got down on her knees and "confessed" that she was doing drugs because she thought that if she told him what he wanted to hear, then she could get out of the situation.

He closed the trunk, told her to get dressed, and took her straight to her grandmother's house.  She did not see the gun anymore; he said it was in the trunk.  She got out of car and went inside.  He came inside in a few minutes.  Hughes said she and her grandmother were in the kitchen but she was afraid to tell her grandmother what transpired because she thought it might endanger her.  She tried to call 911, but appellant grabbed the phone away from her and pushed her on the couch.  Her grandmother, not knowing about the events of the evening, tried to intervene to get them to stop arguing.  He made Hughes tell her grandmother that Hughes was "drinking and drugging."  He had been drinking throughout the evening.  He finally left, then called Hughes later to tell her that he had "made it home okay."

4

The next day, Hughes reported the assault to the police. She had not tried to call the police a second time on the evening of the assault because she was afraid that appellant might be watching through the windows. He called that morning and told her he was only going to work a half day and then come over. She told her aunt what had happened. Her aunt said she needed to talk to police so Hughes walked a half mile to the Kempner[1] police department and made a report.

She described the gun that she saw as a silver handgun that was long and "kind of square shape[d] across the top. The police took pictures of her injuries: bruises, marks, and fingerprints on her arms and a "knot" on her head from when he shoved her in the car and caused her head to hit the dashboard. Because appellant said he was coming over, two officers went with Hughes to her grandmother's house. Appellant was arrested at Hughes' aunt's house that was located about thirty feet from the grandmother's house.

On cross-examination she admitted to using "crack" cocaine but only as a teenager. Although Hughes lived for a while with a sister who was on probation for possessing and dealing methamphetamine, Hughes stated that she had never used methamphetamine herself. She never told appellant that she used methamphetamine. She admitted she had six DWI convictions (four in Florida, two in Texas). She served prison time on her last conviction. Although she found out later that the gun was a pellet gun, she never realized that when she was in the car. She said she could not explain why she did not ask the Pughs for help. She agreed with appellant's counsel that she

---

[1] Kempner is a small town in Lampasas County. Hughes also made a report to the Lampasas County Sheriff's Office. Some evidence relevant to the case was recovered in the county.

could not explain how appellant could simultaneously drive a car with a manual transmission, drink beer, and point a gun at her without having three hands.

Theresa Bearden met Hughes after Bearden moved to Lampasas County; she needed some help with her house and hired Hughes. Hughes revealed to Bearden that she had an alcohol problem but Bearden never saw any behavior to indicate impairment from drugs or alcohol. Appellant told her that Hughes had had a prescription pain reliever and alcohol addiction. Bearden told him that she did not have any prescription pain relievers or alcohol in her house. She thought his behavior was odd for someone's fiancé because his manner was not protective but degrading.

On the night in question, appellant called Bearden between 8:30 and 9:00 p.m. He claimed that Bearden had been giving Hughes pills. He put Hughes on the phone to tell Bearden that she could not work for her anymore. Appellant kept "going on and on" about Bearden giving drugs to Hughes. Bearden eventually "basically hung up on him." She said she always found Hughes to be honest and trustworthy. She saw bruises on Hughes around Christmas. Hughes told her that she and appellant were fighting in the car and she tried to jump out. They ended up spending the night in jail.

Charles Harber was the police chief for the City of Kempner in January 2006. He testified that Hughes was extremely upset when she came in. He took her report and later went with her to her aunt's house, where he arrested appellant. On cross-examination, he said that he has had extensive firearms experience. When he first saw the weapon, he thought it was real. Only when he pulled it from the waistband of appellant's pants, did he realize it was too lightweight to be real, but was an unloaded pellet gun. He said that such a gun was capable of causing serious bodily

6

injury. He had owned this type of pellet pistol that was powered by a carbon-dioxide cannister and said that it would be capable of killing at a close-enough range.

David Thorp, a Lampasas County Sheriff's Department criminal investigator, was the lead investigator on the case. He said the pellet pistol was sold at local discount store. He purchased an identical model for testing. It had a significant amount of power and had inflicted major damage on targets when test fired. He was also able to test fire the one used in the crime and verified that it was in working order. If fired at close range, the pellets could penetrate the body. He admitted that the pellet gun would not "bring down a deer," but thought it might be able to kill a rabbit.

Appellant's videotaped statement was played before the jury. Appellant admitted to having a pellet gun with him that evening, but claimed it was unloaded, the condition in which it was found the next day. He said he did not put the gun to Hughes' head, but simply showed it to her in an effort to scare her into confessing that she was abusing drugs. He said he never removed the gun from the waistband of his pants because it had a piece missing and Hughes would realize it was not real.

**Discussion**

In his first issue, appellant contends that the evidence was legally and factually insufficient because the State failed to prove beyond a reasonable doubt that appellant knowingly and intentionally threatened Hughes with serious bodily injury while exhibiting a deadly weapon. The focus of appellant's argument is that the State failed to prove that the pellet gun, in the manner of its use or intended use, was capable of causing death or serious bodily injury.

7

*Standard of Review*

In reviewing the legal and factual sufficiency of the evidence to support a deadly weapon finding, we use the same standards used to review the sufficiency of the evidence to support a conviction. *Lee v. State*, 51 S.W.3d 365, 371 (Tex. App.—Austin 2001, no pet.); *Brooks v. State*, 900 S.W.3d 468, 472-73 (Tex. App.—Texarkana 1995, no pet.). When there is a challenge to the sufficiency of the evidence, the question is whether a rational trier of fact could have found the essential elements of the offense beyond a reasonable beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 324 (1979); *Johnson v. State*, 23 S.W.3d 1, 11 (Tex. Crim. App. 2000). In a legal sufficiency review, all of the evidence is viewed in the light most favorable to the verdict; it is assumed that the trier of fact resolved conflicts in the testimony, weighed the evidence, and drew reasonable inferences in a manner that supports the verdict. *Griffin v. State*, 614 S.W.2d 155, 158-59 (Tex. Crim. App. 1981). In a factual sufficiency review, we view the evidence in a neutral light and ask whether a jury was rationally justified in finding guilt beyond a reasonable doubt. *Watson v. State*, 204 S.W.3d 404, 414 (Tex. Crim. App. 2006). We then determine whether the evidence supporting the verdict is so weak that the verdict is clearly wrong and manifestly unjust or whether the verdict is against the great weight and preponderance of the conflicting evidence. *Id*. We will not reverse a case on a factual sufficiency challenge unless we can say, with some objective basis in the record, that the great weight and preponderance of the evidence contradicts the jury's verdict. *Id*. at 417.

*Deadly Weapon*

This case involves the often-raised question about the deadliness, or lack thereof, of this type of weapon in which air is used to propel a projectile. *See Adame v. State*, 69 S.W.3d 581, 582 (Tex. Crim. App. 2002) (deadly); *Williams v. State*, No. 03-06-00039-CR, 2007 Tex. App. LEXIS 4295, at *11-12 (Tex. App.—Austin 2007, no pet. h.) (deadly); *Davis v. State*, 180 S.W.3d 277, 286 (Tex. App.—Texarkana 2005, no pet.) (deadly); *In re K.H.*, 169 S.W.3d 459, 464 (Tex. App.—Texarkana 2005, no pet.) (not deadly); *Lee v. State*, 51 S.W.3d 365, 372-73 (Tex. App.—Austin 2001, no pet.) (not deadly); *Delgado v. State*, 986 S.W.2d 306, 308 (Tex. App.—Austin 1999, no pet.) (deadly).

The penal code defines a deadly weapon as "a firearm or anything manifestly designed, made, or adapted for the purpose of inflicting death or serious bodily injury; or anything that in the manner or means of its use or intended use is capable of causing death or serious bodily injury." Tex. Penal Code Ann. § 1.07(a)(17)(A), (B) (West Supp. 2006). The complainant did not die or actually suffer serious bodily injury so the inquiry focuses on whether the weapon used by appellant was capable of causing death or serious bodily injury. *Adame v. State*, 69 S.W.3d 581, 582 (Tex. Crim. App. 2002); *McCain v. State*, 22 S.W.3d 497, 503 (Tex. Crim. App. 2002). When a person is charged with using a deadly weapon, the evidence must establish that the weapon was actually deadly. *Lockett v. State*, 874 S.W.2d 810, 814 (Tex. App.—Dallas 1994, pet. ref'd). Either expert testimony or lay testimony may be sufficient to support a deadly weapon finding. *English v. State*, 647 S.W.2d 667, 668-69 (Tex. Crim. App. 1983). Words spoken by the accused during the commission of the offense may be considered in determining whether a knife or other weapon is a

9

deadly one. *Id*. at 669 (words and actions clearly implied that knife was capable of causing death and serious bodily injury).

Appellant and the State each claim that their position is supported by *Adame v. State*. In *Adame*, the intermediate appellate court held that the evidence was insufficient to support the deadly weapon finding because the State did not present evidence that the BB gun was loaded. *Adame v. State*, 69 S.W.3d 581, 581-82 (Tex. Crim. App. 2002). The court of criminal appeals concluded that the testimony that the gun was capable of causing serious bodily injury made it reasonable for the jury to make a deadly weapon finding. *Id*. at 582. Further, the defendant brandished the gun during a convenience store robbery and threatened the clerk while pointing the gun at her, allowing a reasonable inference that the gun was loaded. *Id*.; *see also Delgado*, 986 S.W.2d at 308 (evidence that defendant brandished pistol, pointed it at robbery victims and threatened to kill them allows reasonable inference that the gun was loaded).

Appellant argues that this case is distinguishable from *Adame* because in this case "the evidence *unequivocally* shows that the gun was not loaded." (Emphasis added.) Such was not the state of the evidence, however. The gun was not recovered until the day after the assault. It contained no pellets, but had a partially charged carbon dioxide cylinder in it. Other than this evidence, the only evidence that the gun was not loaded at the time of the assault was appellant's statement that the gun was not loaded. The jury is the sole judge of the weight and credibility of the evidence. *Johnson*, 23 S.W.3d at 7. The jury was free to disbelieve appellant's self-serving statement. From the evidence presented, the jury could have logically inferred that once appellant realized the magnitude of what he had done, he unloaded the pistol. The jury was free to believe

10

Hughes's testimony that appellant put the gun to her head, used threatening language, described how he could murder her and get away with it, forced her to undress at gunpoint, and draw the inference that the gun was loaded. *See Delgado*, 986 S.W.2d at 308. Further, as in *Adame*, there was testimony that the gun was capable of causing serous bodily injury. 69 S.W.3d at 582.

David Thorp, the lead investigator on the case, testified that based on his tests of the actual weapon, the weapon was capable of firing pellets. His tests on an identical model of the weapon showed it was capable of causing death or serious bodily injury. Charles Harber, the sheriff, testified that the gun was capable of killing at close range.

Much of appellant's argument depends on his assertion that the weapon was unloaded and his different account of the encounter with Hughes. His account of events was that he simply had the weapon visible in his waistband to scare Hughes into ceasing to use drugs. Hughes's version of events was radically different. The jury was entitled to believe Hughes rather than appellant. The jury had evidence from which it could have rationally believed that the gun was loaded and thus capable of being used in a manner in which it could inflict serious bodily injury. The jury could have believed Hughes' version of events in which she was threatened with serious bodily injury, that is, death. Accordingly, the evidence is legally sufficient to support the finding that appellant exhibited a deadly weapon while threatening Hughes with serious bodily injury.

When looking at the factual sufficiency, the evidence showing that the weapon was unloaded was appellant's own statement. That the gun was discovered with no pellets loaded in it is ambiguous evidence. There was a carbon dioxide cartridge loaded in the gun when it was recovered. Appellant could simply have unloaded the weapon in the time after the assault. Accordingly, we

11

cannot say that the evidence was so contrary to the overwhelming weight of the evidence as to be manifestly wrong and unjust.

*Extraneous Offenses*

In his second issue, appellant complains that the trial court erred in failing to sua sponte instruct the jury that before it could consider extraneous offense evidence, it must find that the state proved those offenses beyond a reasonable doubt. Appellant complains that the prosecutor elicited evidence through the testimony of Hughes and Bearden that appellant had previously assaulted Hughes and that he was on parole for some unknown offense at the time of the commission of the offense.

The extraneous offenses about which appellant complains were admitted during the guilt-innocence phase of trial. The court of criminal appeals has held that, if so requested, a trial court must instruct the jury not to consider extraneous offense evidence admitted during the guilt-innocence phase unless it believes beyond a reasonable doubt that the defendant committed the extraneous offense. *George v. State*, 890 S.W.2d 73, 76 (Tex. Crim. App. 1994). No such request was made. Appellant argues that the holding in *Huizar v. State* that the court must sua sponte give such an instruction, regardless of whether such an instruction has been requested in the sentencing stage, should be extended to the guilt-innocence phase. *See* 12 S.W.3d 479, 481-82. This court, however, has previously overruled the same argument and declined to extend *Huizar*. *Wright v. State*, 212 S.W.3d 768, 779 (Tex. App.—Austin 2006, pet. ref'd); *see also Reynolds v. State*, No. 03-06-00229-CR, 2007 Tex. App. LEXIS 986, at *6 (Tex. App.—Austin Feb. 7, 2007, pet. filed) (mem. op., not designated for publication) ("Unless and until the court of criminal appeals instructs

12

us otherwise, we will follow our prior opinion in *Wright*.") (discussing split in authority among intermediate appellate courts). Also, since *Huizar* was decided, the court of criminal appeals has held, "*If a defendant, during the guilt/innocence phase, asks for an instruction* to the jury on the standard of proof required for admitting extraneous offenses, the defendant is entitled to that instruction." *Ex parte Varelas*, 45 S.W.3d 627, 631 (Tex. Crim. App. 2001) (emphasis added) (quoting *Mitchell v. State*, 931 S.W.2d 950, 954 (Tex. Crim. App. 1996)).

Further, even if we assume that the trial court's failure to sua sponte instruct the jury constituted error, appellant cannot show the requisite harm to require reversal. The court of criminal appeals has held that *Almanza's* harm analysis applies to situations such as this one. *Huizar*, 12 S.W.3d at 484-85 (citing *Almanza v. State*, 686 S.W.2d 157 (Tex. Crim. App. 1985) (op. on reh'g)). *Almanza* requires "egregious harm" that goes to the very basis of the case, deprives the accused of a valuable right, or vitally affects his defensive theory. 686 S.W.2d at 172. The harm analysis requires an appellate court to review the entire jury charge and the state of the evidence in the case when deciding whether an error involved "egregious harm." *Id*. Our inquiry focuses on whether appellant "was harmed by the improper omission of the instruction, not by the admission of evidence of extraneous offenses." *Rodgers v. State*, 180 S.W.3d 716, 724 (Tex. App.—Waco 2005, no pet.) (citing *Ellison v. State,* 86 S.W.3d 226, 228 (Tex. Crim. App. 2002)).

Here, appellant cannot show that he suffered egregious harm as a result of the omission of the jury instruction. The evidence about which he complains consists of statements by Hughes, either through her testimony or Bearden's testimony. The jury's verdict indicates that the jurors found Hughes to be credible, despite appellant's considerable efforts to attack her credibility,

because her testimony was the only evidence of many of the critical elements of the offense. The jury concluded that Hughes's testimony was sufficient to support a finding that appellant committed the instant offense beyond a reasonable doubt; it likely would also have found that Hughes's testimony, along with her statements elicited through Bearden's testimony, was sufficient to support a finding that appellant committed the extraneous acts beyond a reasonable doubt. Therefore, if the failure to sua sponte instruct the jury were error, appellant did not suffer egregious harm due to the omission of the instruction. Accordingly, we overrule appellant's second issue.

## Conclusion

We have overruled both of appellant's issues. We affirm the trial court's judgment.

_____

W. Kenneth Law, Chief Justice

Before Chief Justice Law, Justices Puryear and Henson

Affirmed

Filed: August 2, 2007

Do Not Publish

14