Opinion issued August 9, 2007

 












In The

Court of Appeals

For The

First District of Texas






NO. 01-06-00151-CR






LARRY CHARLES SCOTT, Appellant


V.


THE STATE OF TEXAS, Appellee






On Appeal from the 174th District Court

Harris County, Texas

Trial Court Cause No. 1003894






MEMORANDUM OPINION

 Appellant, Larry Charles Scott, appeals from a judgment convicting him of the
felony offense of murder. See Tex. Pen. Code. Ann. § 19.02(b)(1) (Vernon 2003). 
Appellant pleaded not guilty to the trial court. The trial court found appellant guilty
and assessed punishment at 60 years in prison. In his sole issue, appellant challenges
the factual sufficiency of the evidence to establish his identity as the shooter by
pointing to the lack of evidence to connect him to the offense. We conclude that the
evidence was factually sufficient to support the conviction under these circumstances
that show that a witness identified appellant's voice as the person threatening to shoot
the complainant immediately before the complainant was shot; the content of the
statements that the witness heard was consistent with a known motive of appellant;
and appellant acknowledged his plan to meet the complainant at about the same time
that the complainant was murdered. We affirm.

Background

 Appellant's girlfriend, Shirley Jackson, purchased a car from the complainant,
Edgar Rabago, and his brother, Luis Rabago, in April or May 2004. Jackson was
responsible for making payments of $300 per month to the complainant. About five
months later, the complainant went to Jackson's apartment to collect overdue
payments, but Jackson was not there. Appellant, who was at the apartment, gave the
complainant the keys to Jackson's car so that the complainant could purportedly
change the car's paper license plate. Appellant saw the complainant working under
the hood of the car. The next morning, when the car would not start, appellant
discovered the starter fuse had been removed.

 Three days after the starter fuse was removed from the car, appellant called the
complainant to request that the complainant come to appellant's apartment to collect
$100 for Jackson's car payment. The complainant arrived at the apartment complex
at 5:08 p.m. 

 As was their custom when collecting money, Luis listened over the phone
while the complainant was collecting the money. The complainant wore a hands-free
ear bud with a microphone attached so Luis could hear the conversation. Luis could
clearly hear the discussion about Jackson's car. Luis heard appellant say, "What's up
with you disconnecting the fuse. That's some unprofessional s***. You're
disrespecting my lady." Luis heard the complainant exclaim, "You're going to shoot
me? It's just a car." Appellant responded, "F*** yeah. You're not giving her a
break." Luis asked the complainant to cough twice if appellant had a gun pointed at
him. The complainant coughed twice. Luis then heard four loud gunshots. Luis
screamed the complainant's name, but the line remained silent for five to eight
minutes before the call ended. Luis called the police. 

 Joseph Ratcliff, a resident of the apartment complex, was outside his apartment
smoking a cigarette when he saw two men talking in the parking lot. Ratcliff saw a
black man talking to another man who was seated in a car. Ratcliff described the
black man as being similar in build to the complainant and either bald or wearing a
wave cap or "do-rag." Ratcliff watched the two men for between 30 seconds and a
minute, then reentered his apartment. When Ratcliff entered the apartment, he heard
three or four gunshots. 

 A police officer with the Houston Police Department was dispatched at 5:30
p.m. in response to a 911 call placed by the apartment complex's assistant manager,
who reported that a man had been found shot dead in a car. Detective Holtke of the
Harris County Sheriff's Office was led to appellant's address by cross-referencing
phone numbers that had called the complainant's cell phone. Detective Holtke
attempted to locate appellant at appellant's mother's apartment, but no one answered
the door. Police then waited for appellant at Jackson's apartment. Detective Holtke
recovered black jeans, a black bandana, a black hat, a green and blue jersey, and a
blue "do-rag" from Jackson's vehicle, which appellant had driven that day. Ratcliff
identified the "do-rag" as appearing to be similar to the one worn by the black man
he saw in the parking lot. 

 Appellant gave a voluntary statement to police the day of the shooting. He
stated,

 I called [the complainant] on his cell phone and told him I had some
money to give him for Shirley. I asked him to come over and meet me
at the apartments and I gave him directions. He told me he would be
there in about 15 to 20 minutes. I stood outside and waited for a while,
about 20 minutes. After he didn't show I went back inside and called
him again. He said he was just around the corner and was on his way. 
I went back outside and waited for [the complainant] for about another
30 minutes and he never showed up. I went back inside and tried to call
[the complainant] again and he never would answer the phone, so I left. 
It was around 6 or 6:30 [p.m.] when I left my mother's apartment. The
whole time I was there I stayed at or outside of my mother's apartment. 
I didn't talk to anyone at the complex while I was there.


 Appellant testified at trial, acknowledging that he called the complainant and
arranged to meet him at the apartment complex. Appellant claimed he went outside
to meet the complainant after the complainant told appellant he was just around the
corner. Appellant said that he waited about 30 minutes before he went inside to take
a shower, but the complainant never arrived. Appellant asserts that he never saw the
complainant. Appellant also claimed that although he left the apartment complex
between 6:00 p.m. and 6:30 p.m., he did not notice any police presence while waiting
for the complainant or upon leaving the complex. The State challenged appellant's
credibility on the issue of whether appellant saw police officers at the complex by
presenting evidence that to exit the parking lot appellant must have driven past the
police activity and the purple BMW containing the complainant's body. Patrol cars
and the crime scene unit were at the scene from about 5:30 p.m. until 7:30 p.m. 
Officer Gonzales testified that the police presence was "very obvious" and appellant
could only have missed it if he had his eyes closed.

Factual Sufficiency

 In his sole issue, appellant challenges the factual sufficiency of the evidence
to support his murder conviction. Appellant challenges the factual sufficiency of the
State's evidence to prove Scott's identity as the shooter because no "eyewitness"
conclusively identified Scott. Appellant further contends the evidence is factually
insufficient because no fingerprint, blood, gun, or other similar evidence connects
appellant to the murder. Appellant also claims that he was not upset about the fuse
because he easily got the car started and therefore had no motive to murder the
complainant. 

 When conducting a factual-sufficiency review, we view all of the evidence in
a neutral light. Cain v. State, 958 S.W.2d 404, 408 (Tex. Crim. App. 1997). We will
set the verdict aside only if (1) the evidence is so weak that the verdict is clearly
wrong and manifestly unjust or (2) the verdict is against the great weight and
preponderance of the evidence. Johnson v. State, 23 S.W.3d 1, 11 (Tex. Crim. App.
2000). Under the first prong of Johnson, we cannot conclude that a conviction is
"clearly wrong" or "manifestly unjust" simply because, on the evidence before us, we
would have voted to acquit had we been on the jury. Watson v. State, 204 S.W.3d
404, 417 (Tex. Crim. App. 2006). Under the second prong of Johnson, we cannot
declare that a conflict in the evidence justifies a new trial simply because we disagree
with the jury's resolution of that conflict. Id. Before determining that evidence is
factually insufficient to support a verdict under the second prong of Johnson, we must
be able to say, with some objective basis in the record, that the great weight and
preponderance of the evidence contradicts the jury's verdict. Id. In conducting a
factual-sufficiency review, we must also discuss the evidence that, according to the
appellant, most undermines the jury's verdict. See Sims v. State, 99 S.W.3d 600, 603
(Tex. Crim. App. 2003). 

 The jury is in the best position to evaluate the credibility of witnesses, and we
are required in our factual sufficiency review to afford "due deference" to the jury's
determinations. Marshall v. State, 210 S.W.3d 618, 625 (Tex. Crim. App. 2006). A
person commits murder if he intentionally and knowingly causes the death of an
individual. See Tex. Pen. Code Ann. § 19.02(b)(1).

 Although appellant is correct that the record fails to include any eyewitness
identification, eyewitness testimony is unnecessary, as long as other evidence
establishes guilt for the offense. See Greene v. State, 124 S.W.3d 789, 792 (Tex.
App.--Houston [1st Dist.] 2003, pet. ref'd) ("Identity of a perpetrator can be proved
by direct or circumstantial evidence; eyewitness identification is not necessary."). 
Similarly, appellant accurately notes the absence of physical evidence such as
fingerprints and the murder weapon, but the State was not required to provide any
direct evidence as long as the circumstantial evidence was factually sufficient to
support the conviction. See id.

 The State's evidence to establish appellant's identity as the shooter consisted
of the voice identification of him by Luis, combined with circumstantial evidence that
supported that identification. Voice identification has been held factually sufficient
to support a conviction. See Davis v. State, 180 S.W.3d 277, 286 (Tex.
App.--Texarkana 2005, no pet.) (holding voice identification to be legally and
factually sufficient to support conviction). Luis identified appellant in a photo spread
the day after the murder as the person whose voice he heard speaking with the
complainant when the complainant was shot. He also identified appellant in the
courtroom. Luis related that he could hear the voices of appellant and the
complainant clearly. 

 In addition to the voice identification of appellant by Luis, circumstantial
evidence supports Luis's identification. Before the meeting with appellant, the
complainant told Luis that he was going to meet appellant in order to collect money
for Jackson's car. The cell phone records corroborated Luis's testimony describing
the conversation Luis overheard between appellant and the complainant on the day
and time the complainant was shot by showing a 14-minute call beginning at 5:08
p.m. Luis was also able to give exact quotations from the conversation concerning
the fuse taken from the car, the complainant being accused of "disrespecting
[appellant's] lady," the late car payments, the whereabouts of the car, and Luis heard
appellant threaten to shoot the complainant before Luis heard the gunshots. The
complainant coughed twice when Luis instructed him to cough twice if appellant had
a gun. The evidence that the complainant told Luis he was going to meet the
complainant and the content of the conversation that Luis heard is further evidence
of appellant's identity as the shooter and appellant's anger with the complainant over
Jackson's car.

 Ratcliff's testimony is also some evidence that supports Luis's identification
of appellant as the shooter. Although Ratcliff could not identify the man he saw in
the parking lot, he described the "black man" he saw as being bald or wearing a "do-rag" with hair that was not long enough to reach his collar. A police officer found a
"do-rag" in Jackson's car, which is a physical piece of evidence that further supports
Luis's identification. Appellant discounts this evidence by pointing to evidence
presented by appellant and Jackson that appellant had long, braided hair on the day
of the murder. The trial court, however, could have disbelieved the testimony by
appellant and Jackson based on an evaluation of their credibility and demeanor, or it
could have disregarded the evidence in its entirety by concluding that the other
evidence presented by Luis was sufficient to establish appellant's guilt. See Cain,
958 S.W.2d at 409. 

 As the fact finder, the trial court could have reasonably disregarded portions
of appellant's testimony as not credible, and it could have reasonably determined that
other portions of appellant's testimony are consistent with appellant's guilt. See id. 
Appellant acknowledges his plan to meet the complainant at about the same time that
the complainant was killed. The complainant was shot sometime between 5:08 p.m.
and 5:30 p.m., when the complainant's body was discovered by an apartment
manager. Appellant acknowledges that he spoke to the complainant just before that
period of time, at 5:05 p.m., when the complainant told appellant that he was "just
around the corner." Appellant thereby acknowledges his plan to meet the
complainant at the same time and place that the complainant was killed. 

 The trial court could have reasonably disbelieved appellant's claims that he did
not shoot the complainant due to the State's evidence that challenged appellant's
credibility. According to appellant's testimony, he did not witness the police
presence at the apartment complex when he was outside waiting for the complainant
from 5:05 p.m. until sometime between 5:25 p.m. and 5:35 p.m. That testimony was
challenged by Officer Gonzales's testimony that described the police presence as
"obvious." According to Officer Gonzales, appellant could have missed the police
activity only if he had his eyes closed when he left the complex. 

 Although the record shows a lack of direct evidence to connect appellant to the
offense, the evidence shows a positive voice identification of appellant as the shooter,
as well as circumstantial evidence in support of that identification. Viewing the
evidence neutrally, the evidence is not so weak as to render the verdict clearly wrong
and manifestly unjust, and the judgment is not against the great weight and
preponderance of the evidence. See Johnson, 23 S.W.3d at 11. We hold that the
evidence is factually sufficient to sustain appellant's conviction for murder. We
overrule appellant's sole issue.

Conclusion

 We affirm the judgment of the trial court.


 


 Elsa Alcala

 Justice


Panel consists of Justices Alcala, Hanks, and Price. (1)


Do not publish. Tex. R. App. P. 47.2(b).

 
1. The Honorable Frank C. Price, former Justice, Court of Appeals, First District of
Texas at Houston, sitting by assignment.