ACCEPTED
01-14-00886-CR
FIRST COURT OF APPEALS
HOUSTON, TEXAS
10/14/2015 9:12:40 AM
CHRISTOPHER PRINE
CLERK

# No. 01-14-00886-CR

In the
Court of Appeals
For the
First District of Texas
At Houston

————————◆————————

FILED IN
1st COURT OF APPEALS
HOUSTON, TEXAS

10/14/2015 9:12:40 AM

CHRISTOPHER A. PRINE
Clerk

**No. 1389543**
In the 248th District Court
Of Harris County, Texas

————————◆————————

# ANA MARIA GONZALEZ-ANGULO

*Appellant*

V.

# THE STATE OF TEXAS

*Appellee*

————————◆————————

# STATE'S APPELLATE BRIEF

————————◆————————

**DEVON ANDERSON**
District Attorney
Harris County, Texas

**ERIC KUGLER**
Assistant District Attorney
Harris County, Texas
TBC No. 796910
kugler_eric@dao.hctx.net

**JUSTIN KEITER**
**NATHAN HENNIGAN**
Assistant District Attorneys
Harris County, Texas

1201 Franklin, Suite 600
Houston, Texas 77002
Tel: (713) 755-5826
FAX: (713) 755-5809

*Counsel for Appellee*

ORAL ARGUMENT REQUESTED ONLY IF GRANTED TO APPELLANT

## STATEMENT REGARDING ORAL ARGUMENT

Pursuant to Tᴇx. R. Aᴘᴘ. P. 39, the State requests oral argument only if oral argument is granted to the appellant.

## IDENTIFICATION OF THE PARTIES

Counsel for the State:

**Devon Anderson** — District Attorney of Harris County

**Eric Kugler** — Assistant District Attorney on appeal

**Justin Keiter; Nathan Hennigan** — Assistant District Attorneys at trial

Appellant or criminal defendant:

**Ana Maria Gonzalez-Angulo**

Counsel for Appellant:

**Barbara Drumheller** — Counsel on appeal

**Derek Hollingsworth; Andy Drumheller** — Counsel at trial

Trial Judge:

**Hon. Katherine Cabaniss** — Presiding Judge

# TABLE OF CONTENTS

**Page**

STATEMENT REGARDING ORAL ARGUMENT ................................................i

IDENTIFICATION OF THE PARTIES ....................................................i

INDEX OF AUTHORITIES.............................................................. iii

STATEMENT OF THE CASE..........................................................1

STATEMENT OF FACTS ............................................................1

REPLY TO APPELLANT'S SECOND AND THIRD POINTS OF ERROR .......32

A rational jury could have found beyond a reasonable doubt that the appellant committed the aggravated assault of a person with whom she had been in a dating relationship. ......................................................32

REPLY TO APPELLANT'S FIRST POINT OF ERROR.....................................41

The trial court did not abuse its discretion in denying the appellant's motion for new trial based on alleged newly discovered evidence because it could have disbelieved the new evidence and believed Blumenschein's affidavit, which contradicted much of the allegedly new evidence. ............................................43

REPLY TO APPELLANT'S FOURTH POINT OF ERROR...............................48

A. DeSilva had a strong basis for identifying the appellant and there were numerous pieces of evidence to connect the appellant to the anonymous GlaxoSmithKline caller even without DeSilva's identification.........................49

B. The appellant was not harmed by the admission of her voice identification because other evidence linked her to the GlaxoSmithKline investigation, and that investigation related to a collateral issue in the case. ...........................54

CONCLUSION...................................................................57

CERTIFICATE OF SERVICE AND COMPLIANCE ...........................................58

ii

# INDEX OF AUTHORITIES

**CASES**

*Adams v. State*,
397 S.W.3d 760 (Tex. App.—
Houston [14th Dist.] 2013, no pet.)................................................................. 49, 51

*Aviles-Barroso v. State*,
14-14-00142-CR, 2015 WL 5157472 (Tex. App.—
Houston [14th Dist.] Aug. 27, 2015, no. pet. h.)............................................. 49, 50

*Barley v. State*,
906 S.W.2d 27 (Tex. Crim. App. 1995)................................................................49

*Brooks v. State*,
323 S.W.3d 893 (Tex. Crim. App. 2010)..............................................................33

*Chambers v. State*,
805 S.W.2d 459 (Tex. Crim. App. 1991)..............................................................33

*Coffin v. State*,
885 S.W.2d 140 (Tex. Crim. App. 1994)..............................................................48

*Colyer v. State*,
428 S.W.3d 117 (Tex. Crim. App. 2014)..............................................................42

*Conner v. State*,
67 S.W.3d 192 (Tex. Crim. App. 2001)............................................................ 48, 49

*Davis v. State*,
180 S.W.3d 277 (Tex.App.—
Texarkana 2005, no pet.).......................................................................................50

*Green v. State*,
934 S.W.2d 92 (Tex. Crim. App. 1996)................................................................48

*Guzman v. State*,
955 S.W.2d 85 (Tex. Crim. App. 1997)................................................................48

*Halton v. State*,
05-14-00640-CR, 2015 WL 3991827 (Tex. App.—
Dallas July 1, 2015, no pet.)..................................................................................35

*Holden v. State*,
201 S.W.3d 761 (Tex. Crim. App. 2006)........................................................42

*Huffman v. State*,
775 S.W.2d 653 (Tex. App.—
El Paso 1989, pet. ref'd)................................................................................35

*Ibarra v. State*,
11 S.W.3d 189 (Tex. Crim. App. 1999).................................................. 49, 51

*Jackson v. Virginia*,
443 U.S. 307319 (1979) ........................................................... 32, 37, 40

*Johnson v. State*,
871 S.W.2d 183 (Tex. Crim. App. 1993)......................................................34

*Keeter v. State*,
74 S.W.3d 31 (Tex. Crim. App. 2002)..........................................................42

*King v. State*,
29 S.W.3d 556 (Tex. Crim. App. 2000)........................................................33

*Lewis v. State*,
911 S.W.2d 1 (Tex. Crim. App. 1995)..................................................... 43, 45

*McCarthy v. State*,
65 S.W.3d 47 (Tex. Crim. App. 2001)..........................................................54

*Neil v. Biggers*,
409 U.S. 188 (1972) ....................................................................... 49, 50

*Okonkwo v. State*,
398 S.W.3d 689 (Tex. Crim. App. 2013).................................................. 43, 45

*Palomo v. State*,
352 S.W.3d 87 (Tex. App.—
Houston [14th Dist.] 2011, pet. ref'd)............................................................35

*Santos v. State*,
116 S.W.3d 447 (Tex. App.—
Houston [14th Dist.] 2003, pet. ref'd)............................................................49

*Stobaugh v. State*,
421 S.W.3d 787 (Tex. App.—
Fort Worth 2014)............................................................................................38

*Wall v. State*,
184 S.W.3d 730 (Tex. Crim. App. 2006)......................................................54

*Wallace v. State*,
106 S.W.3d 103 (Tex. Crim. App. 2003)........................................................... 43, 47

*Webb v. State*,
232 S.W.3d 109 (Tex. Crim. App. 2007)..............................................................42

*Wesbrook v. State*,
29 S.W.3d 103 (Tex. Crim. App. 2000)................................................................54

*Williams v. State*,
116 S.W.3d 788 (Tex. Crim. App. 2003)..............................................................50

## STATUTES

TEX. CODE CRIM. PROC. art. 40.001 (West 2012)......................................................43

TEX. FAMILY CODE § 71.0021(b) (West 2010) ........................................... 33, 34, 40

TEX. FAMILY CODE § 71.0021(c) (West 2010) ..........................................................33

TEX. PENAL CODE § 1.07 (West 2010)......................................................................33

TEX. PENAL CODE § 22.02(b)(1) (West 2010) ..........................................................33

TEX. PENAL CODE § 37.02 (West 2012)....................................................................46

## RULES

TEX. R. APP. P. 39............................................................................................... i

TEX. R. APP. P. 44.2(a) ...........................................................................................54

TEX. R. EVID. 401 ...................................................................................................44

**TO THE HONORABLE COURT OF APPEALS:**

## STATEMENT OF THE CASE

The appellant was charged with the aggravated assault of her boyfriend, George Blumenschein, by poisoning him with ethylene glycol on January 27, 2013 (CR – 23). She pled "not guilty" to the charge, and the case was tried to a jury (CR – 155). The jury found her guilty and assessed punishment at ten years in prison on September 29, 2014 (CR – 155). The appellant filed notice of appeal one month later, and the trial court certified that she had the right to appeal (CR – 158, 160).

## STATEMENT OF FACTS

George Blumenschein was a medical oncologist at MD Anderson Cancer Center (RR. VI – 148-149) (RR. IX – 145). His supervisor was Bonnie Glisson, a professor of medicine at MD Anderson (RR. VII – 99-101). Blumenschein did his fellowship at MD Anderson in 1997 (RR. IX – 139). That same year, he met Evette Toney, and the two started dating; however, she then moved to Boston to earn a master's degree (RR. V – 176) (RR. IX – 149-150) (RR. X – 251-252). Toney returned to Houston in 2003 to pursue her doctorate in clinical epidemiology, and the couple resumed their relationship (RR. IX – 150-151) (RR.

X – 252).  Toney lived with Blumenschein for a few months before getting her own apartment (RR. IX – 152).

In 2007, Blumenschein bought a house and asked Toney to move in with him; she did (RR. IX – 153) (RR. X – 254).  Toney wanted to get married, but Blumenschein was not on the same page, so she bought her own house in 2009 and moved out (RR. IX – 153-154) (RR. X – 256-257).  Blumenschein asked her to return to his home, and she did so in late 2009 or early 2010 (RR. IX – 154) (RR. X – 257).  Blumenschein was in good health and had no liver or kidney problems at that time (RR. IX – 248-249).

The appellant was also a physician and breast oncologist at MD Anderson (RR. V – 77) (RR. VII – 102-103).  She was married, and she and her husband were trying a have a child through in vitro fertilization (IVF) (RR. XII – 51).  But the side effects of IVF were very difficult on her, and the implantation did not work (RR. XII – 51).

In 2004, the appellant called Blumenschein and asked him to take over the care of a patient who had previously seen Blumenschein's father, who was also a physician (RR. IX – 148, 156).  Blumenschein did not interact with the appellant again until 2008, when she invited a group of physicians to a cancer conference in Columbia (RR. IX – 156).  Blumenschein went to the conference and thought that the appellant was "very nice." (RR. IX – 157).  During one of his trips to

2

Columbia, Blumenschein and the appellant toured a coffee plantation and learned that the way to experience coffee was to take it black and not adulterate it with anything else (RR. IX – 181).  And that is the way that Blumenschein would drink his coffee (RR. IX – 180) (RR. X – 275) (RR. XII – 28).

Eventually, the appellant and Blumenschein collaborated on a potential clinical trial targeting a cancer cell that involved both lung and breast cancer (RR. IX – 157-158).  Blumenschein told her that he wanted to learn how to write grants, and the appellant volunteered to teach him (RR. IX – 158).  In December 2010, the appellant wrote him an email that said: "Love to work with you on these grants…P.S.…I've seen how you…seem to really like children. I think you'd be a great dad. You should have kids." (RR. IX – 159).  One day the appellant held up her hand for Blumenschein to see that she had no ring (RR. IX – 160).  She told him that she was getting a divorce (RR. IX – 160).  But she also knew that he was in a long-term relationship with Toney (RR. IX – 159-160) (RR. XII – 52-53).

Around March 2011, the appellant and Blumenschein were working on a grant in Blumenschein's office (RR. IX – 161).  They were both looking at the same computer when the appellant insisted that she sit on Blumenschein's knee (RR. IX – 161).  She then advanced the relationship and started lying on his shoulders and kissing him on the neck (RR. IX – 162).  He said "no," but the appellant did not accept that answer (RR. IX – 162).  The appellant said that she

loved him like a brother, but he insisted that she was touching too much (RR. IX – 163). She said that it was a cultural thing from Columbia (RR. IX – 163).

Around September 2011, they had both travelled to Stockholm when the appellant performed oral sex on Blumenschein (RR. IX – 163-164). They started to have an affair despite the fact that Blumenschein repeatedly told her that it was a bad idea (RR. IX – 164-165, 167). At one point, the appellant said, "I'd have a kid with you…No, no, no. I can have a kid with you. I could move to Europe for a year and I could come back and you could be the uncle." (RR. IX – 166). The appellant rejected that offer, but the appellant responded, "Well, you better think about it and do it soon because I don't have lot of time." (RR. IX – 166, 171). The appellant also complained that they never took the relationship further than oral sex; they never had sexual intercourse, and the appellant was disappointed about that (RR. IX – 168-169).

Professionally, the appellant and Blumenschein were doing well because they were generating interest among pharmaceutical companies (RR. IX – 172). But working together was difficult due to increasing demands (RR. IX – 193). And their behavior aroused suspicions in the office, especially with Glisson (RR. VII – 103-104, 175-176, 236-239). But when Glisson and other coworkers confronted Blumenschein about the apparent affair, he denied it (RR. VII – 104, 113, 238-239). Nevertheless, the appellant did reveal the affair to one of her

4

closest friends at MD Anderson, another breast medical oncologist named Jennifer Litton (RR. XII – 54).

The appellant bought Blumenschein many expensive gifts, which he did not want (RR. IX – 176-179) (RR. X – 274-275). And she would often copy his style, buying the same brand of luggage, the same brand of watch, and the same kind of Porsche (RR. IX – 255) (RR. X – 7-8). She named him in her will, and he was one of her two executors (RR. VII – 299-301) (RR. X – 26) (St. Ex. 31). She would also tell her coworkers that Blumenschein had been "good" to her, that he was her best friend in the United States, and that she "cared for him." (RR. VII – 176, 237-239). One coworker thought that the appellant had a crush on Blumenschein (RR. VII – 230).

When they traveled together to conferences, the appellant would sometimes say, "Oh, there's no rooms [sic] left. If you want to come to this conference, you'll have to split a room with me. You'll save money. Don't worry about it." (RR. X – 12). But sometimes the appellant was lying about those circumstances (RR. X – 13).

In December 2011, the appellant confronted Blumenschein about her suspicions that he was adopting a child (RR. IX – 174). It turned out that Blumenschein was merely acting as a reference for a friend who was adopting (RR. IX – 173-175). Nevertheless, that confrontation bothered Blumenschein

because those reference lists were supposed to be confidential, and he wondered how the appellant obtained access to it (RR. IX – 175).

In May 2012, Toney told Blumenschein that she wanted to take the next step in their relationship, which meant having a family (RR. IX – 215-217) (RR. X – 265). Toney became pregnant with twins through IVF and was placed on bedrest during that summer (RR. IX – 217) (RR. X – 265-266). While she was on bedrest, she allowed her sister to drive her company car, which was not allowed by her employer, GlaxoSmithKline (RR. IX – 218-219) (RR. X – 266, 268-270). When Toney's sister was involved in an accident, Toney became worried because she did not have a doctor's note ordering her not to drive (RR. IX – 219) (RR. X – 270-271). Blumenschein shared these concerns with the appellant without mentioning the pregnancy, and the appellant wrote a fraudulent note for Toney even though the appellant was not her physician and despite the fact that Blumenschein refused the offer (RR. VII – 194-195) (RR. IX – 220-224) (RR. X – 272). Toney gave the appellant's note to her employer even though it was a lie (RR. IX – 223-224) (RR. X – 273) (St. Ex. 18).

Toney miscarried her twins in September 2012 (RR. IX – 226) (RR. X – 272). Blumenschein finally told the appellant about Toney's pregnancy and miscarriage in October 2012 (RR. IX – 226-229). Around that time, Litton noticed that the appellant was more agitated, more tearful, and more prone to anger than

6

she had been in the past (RR. XII – 57, 59).  Other coworkers also noted that the appellant became very emotional and would often cry (RR. VII – 188, 199).  She told one of them that Blumenschein wasn't eating again and that he needed to start eating; she also mentioned IVF during that same phone call (RR. VII – 199-200).  Litton was concerned about the appellant and encouraged her to seek counseling (RR. XII – 59).

Blumenschein and Toney drove to his parents' house in Arlington for Thanksgiving 2012 (RR. IX – 183-185).  When they returned, there was an anonymous letter addressed to Toney (RR. IX – 186) (RR. X – 277).  It said something like, "He's interfering in my working life. She's interfering in your personal life. We should meet to discuss this, and we should do this before— because things will become more complicated with Ana's impending pregnancy…Meet me at Starbucks Tuesday at noon." (RR. IX – 187) (RR. X – 277-278).  Both Toney's name and the appellant's name were misspelled in the note (RR. IX – 187).  Toney asked Blumenschein if he was having an affair with the appellant, but he denied it, and she believed him (RR. X – 278).

Blumenschein talked about the note with both Toney and the appellant, but he could not go to Starbucks on Tuesday at noon because he had a clinic (RR. IX – 187-188, 191).  When Blumenschein showed the note to the appellant, she told him that it was just someone trying to mess with his head (RR. IX – 189-190) (RR. X –

279). He did not call the police because he did not see the note as overtly threatening (RR. IX – 189). And no one went to Starbucks (RR. IX – 191) (RR. X – 280).

The appellant told Blumenschein that she received an anonymous phone call at MD Anderson saying, "You better leave him alone. You better stop working with him. This is a warning." (RR. IX – 192). She said it was "somebody trying to mess with my head…they must be jealous of us being successful. Don't worry about it." (RR. IX – 192). According to the phone records, there was no evidence of any such anonymous calls around either November 20 or December 11 (RR. VIII – 272, 274).

On December 17, 2012, a coworker told Blumenschein to call the appellant, which he did; the appellant stated that she had been attacked at her home, beaten, and thrown to the ground (RR. IX – 194). The appellant said that someone buzzed her intercom to let her know that her mailbox was open but that when she went to close it, a black man and a black woman grabbed her, threw her to the ground, kicked her repeatedly, said, "You better stop working with him," and then ran away (RR. VII – 77-78, 244-247) (RR. IX – 195) (RR. X – 286) (RR. XII – 62-63). Blumenschein insisted that she call the police, but she refused (RR. VII – 245-246) (RR. IX – 195-196) (RR. XII – 64). He drove over to her house and did not see any injuries consistent with such an assault, and neither did her coworkers (RR.

8

VII – 212, 252) (RR. IX – 197-198, 204) (RR. X – 282, 284) (RR. XII – 63-64). Furthermore, the appellant wrote a cogent and coherent email dealing with an MD Anderson study less than fifteen minutes after the alleged attack occurred; there was no mention of the assault in that email nor any hint that a traumatic event had just occurred (RR. IX – 19-21) (St. Ex. 134). When Blumenschein returned home, Toney confronted him about what was going on, but he said nothing about the affair (RR. IX – 202).

The next day, the appellant asked if she could stay with Blumenschein and Toney because she was afraid (RR. IX – 203-204) (RR. X – 283). When the appellant arrived at their house, the three talked about possible suspects (RR. IX – 205). The appellant suggested it was another doctor named Funda Meric-Bernstam who was supposedly jealous of their research (RR. IX – 205) (RR. X – 284). Such an accusation was odd because the appellant was apparently close friends with Meric-Bernstam, who was a surgical oncologist at MS Anderson (RR. V – 74, 93). The appellant said that she was going to investigate Meric-Bernstam (RR. IX – 205). She said that she was having two bodyguards fly in from Colombia that Friday who were going to get permits for guns (RR. IX – 206) (RR. X – 285). A couple of weeks later, the appellant added to the story, claiming that the assailants said, "Oh, and you won't be having his baby." (RR. IX – 198).

Blumenschein continued to push the appellant to make a police report, even while the two went to San Francisco for an advisory board meeting, and she eventually agreed to go when they returned to Houston if Blumenschein would accompany her (RR. VII – 82) (RR. IX – 207-210).  The appellant made her report at the City of Southside Place police station; such reports are extremely rare in that small and upscale community (RR. VII – 72, 78).  There were twelve residences within a couple hundred feet of the appellant's mailbox, but not one call was made to the police that evening of the alleged assault (RR. VII – 90-91).  Furthermore, the appellant never provided the police any additional information from a private investigator who she allegedly hired to look into the assault (RR. VII – 94).

While they were at the police station, the appellant said, "Aha, I know something you don't know…You don't know what's going on in your house…There was a black man staying at your house last night." (RR. IX – 211-212).  Blumenschein knew that Toney's cousin, who was African-American, was staying with Toney while Blumenschein was in San Francisco (RR. IX – 212) (RR. X – 289).  But he was surprised that the appellant knew and asked her, "How in the hell did you know that?" (RR. IX – 212).  The appellant responded, "I had your house watched," and Blumenschein told her never to do that again (RR. IX – 212).

On January 3, 2013, Toney had an operation at Texas Women's Hospital to improve her ability to carry a baby to term (RR. IX – 229-230) (RR. X – 9).  She

stayed at the hospital for a few days, and Blumenschein drove her car during that time as an authorized driver (RR. IX – 231-232) (RR. X – 9). During one of those days, Blumenschein left work around 5:30 p.m. and told the appellant that he needed to go home, but instead he went to see Toney at the hospital (RR. IX – 233-234) (RR. XI – 17). The traffic was very heavy, so Blumenschein took many back streets (RR. IX – 234-235). A few days later, the appellant confronted him angrily and said, "You lied to me….You didn't go home. You went to the hospital. You went [to] the Women's Hospital." (RR. IX – 234). Blumenschein asked how she knew that, and the appellant responded, "I had you watched. I had you watched." (RR. IX – 234). Blumenschein said, "Do not do this again, never again. Stop it." (RR. IX – 235).

Despite naming her as a suspect in the mailbox assault, the appellant would sometimes talk to Meric-Bernstam about her relationship with Blumenschein; but she insisted that it was professional (RR. V – 93). Nevertheless, Meric-Bernstam was worried that the appellant was attached to Blumenschein whereas Blumenschein had a long-time girlfriend and was not emotionally available to the appellant (RR. V – 93). Meric-Bernstam was worried that the appellant would get hurt (RR. V – 93).

The appellant told Cathy Eng, a professor of colorectoral cancer and a clinical researcher at MD Anderson, about her affair with Blumenschein (RR. V –

11

172, 180-181). She also told Eng about the alleged attack near her mailbox (RR. V – 181). She stated that she tried to file a police report but that she had a difficult time at the police station (RR. V – 182). She claimed that she called someone from back home to assist in the investigation, and then she pointed the finger at Toney (RR. V – 201). She made similar statements to other coworkers (RR. VII – 254-259).

Sometime in early January 2013, Blumenschein started telling some of his coworkers that he was finally thinking of getting married to Toney (RR. VII – 198). On January 26, 2013, Blumenschein returned to Houston from a conference in San Diego (RR. IX – 237, 241). On the plane, he sat next to an old friend, Mark Gilbert, who was a neuro-oncologist at MD Anderson (RR. VI – 84-86). They had glasses of wine from the same bottle and ate the same meal (RR. VI – 24, 93-100) (RR. IX – 241-242). Gilbert believed that Blumenschein was acting normally (RR. VI – 100). After they landed in Houston, Blumenschein picked up some food from Niko Niko's Greek restaurant for himself and Toney, which they ate together (RR. VI – 123-133) (RR. IX – 243-246) (RR. XI – 21-23). They then went to bed around 8:00 p.m. (RR. IX – 248) (RR. XI – 23).

The next morning, a Saturday, they woke up at 7:00 a.m., and Blumenschein felt great (RR. IX – 249-250) (RR. XI – 24). He planned to meet the appellant at MD Anderson to work, but she insisted that he stop by her house first (RR. IX –

250-251, 299). The appellant said that she had made breakfast and had some special Columbian coffee for him (RR. IX – 250-251). When he arrived, the coffee was already prepared, and Blumenschein had a few sips; but it was too sweet for his taste (RR. IX – 252-253). They had oral sex and a shot of vodka before driving into work (RR. IX – 253-256).

The appellant made a travel mug of coffee for Blumenschein to take with them to work, although the appellant was more of a Diet-Coke person (RR. IX – 257). The coffee was incredibly and sickeningly sweet (RR. IX – 258-259). When Blumenschein complained, the appellant said that it was Splenda despite the fact that she knew that Blumenschein drank his coffee black (RR. IX – 259-260). At around 10:00 a.m., the appellant took the coffee away, and Blumenschein thought that she had tossed it in the sink, but she returned with two cups of coffee (RR. IX – 262-264). The appellant said that one cup of coffee was special and expensive and that he needed to finish it first (RR. IX – 265). Blumenschein took some more sips but then threw it in the trash (RR. IX – 265). The appellant then handed him the second cup of coffee, which was still sweet but not as sweet as the earlier coffee, and Blumenschein likely finished that cup (RR. VII – 108-109) (RR. IX – 265-266).

Around 11:00 a.m. that morning, Blumenschein became light-headed and felt intoxicated (RR. IX – 267-268). He commented to the appellant that he was

slurring his words, but she said, "Oh, you're hypoglycemic. You haven't eaten anything. Don't worry about it." (RR. IX – 268). But Blumenschein had been healthy and was worried that he was having a stroke (RR. IX – 268).

Blumenschein appeared disheveled and abnormal to his colleagues that were at work (RR. VI – 181-183) (RR. VII – 110). He called Toney around 1:30 p.m. and said, "Evette, I'm not feeling well. I'm calling because if something happens, I want you to know that my speech is slurred and I'm not feeling well." (RR. XI – 28-29). Toney asked him to go to the hospital, but he responded, "I haven't had anything to eat. I just had coffee this morning. So maybe I should eat something and I may feel better." (RR. IX – 268-269) (RR. XI – 29). He continued to work (RR. IX – 269). The appellant said again, "You know, you're just hypoglycemic. We'll go to my place and get something to eat." (RR. IX – 270). Before leaving MD Anderson with Blumenschein, the appellant packed up her travel coffee cup that had contained the special coffee (RR. IX – 306).

The appellant drove Blumenschein back to her house and laid out a plate of cheese and sausage (RR. IX – 272). When Blumenschein cut into the sausage, he cut his thumb so badly that it would not stop bleeding (RR. IX – 272-273). The appellant called Meric-Bernstam, who came over, looked at the cut, and told Blumenschein to go to the hospital if he was still not feeling well after dinner (RR. V – 74, 79-80) (RR. IX – 273-275). Meric-Bernstam was concerned about his

14

reactions and performed a neurologic sobriety test on him (RR. V – 82). She then suggested that he go to an emergency room, but he refused (RR. V – 83). He told Meric-Bernstam how upset he was about the sweet coffee; and the appellant seemed to be irritated that he was "making such a big deal about it." (RR. V – 85).

Blumenschein had an important dinner that evening at Feast to discuss getting his own cancer center at the University of Virginia, and he was worried that he would slur his speech or say something stupid (RR. IX – 275-277). He drank water, not wine during the meal (RR. IX – 277). Nevertheless, he kept dropping his eating utensils, jostling the dishes, and fumbling his BlackBerry (RR. IX – 276-277). His dinner companions, who included Eng, asked if he had taken Oxycontin and kept telling him to go to the hospital (RR. V – 184-192, 235, 241-244) (RR. IX – 278, 283). He called Toney around 8:00 p.m. and told her in very slurred speech, "I'm constantly dropping my utensils. I can barely walk." (RR. XI – 36).

After dinner, Blumenschein wanted to go to the hospital, and the appellant assured Eng that she would take him there; but she drove him back to her house instead (RR. V – 192, 226) (RR. IX – 279-281). When they arrived, Blumenschein asked for his keys, but the appellant would not give them to him (RR. IX – 281). He tried to use his BlackBerry while he was in the bathroom, but he couldn't manipulate it and ended up dropping it in the toilet, which disabled the phone (RR. IX – 281).

Toney was attempting to reach Blumenschein on his cell phone, but there was no answer (RR. XI – 40). She finally called the appellant at 10:16 p.m., and the appellant stated that Blumenschein was at her house (RR. XI – 42). The appellant was calm and said, "I have his keys and he's still sick. He's very sick….He can barely walk, Evette, so I took away his keys." (RR. XI – 42-43). Toney replied, "Great. Keep him there. I'm on my way. I'm going to pick him up and take him to the hospital." (RR. XI – 42-44). The appellant, however, then handed Blumenschein his keys (RR. IX – 282).

Toney arrived at the appellant's house at 10:27 p.m., but the appellant and Blumenschein were already gone (RR. IX – 45-46). When Toney called the appellant, the appellant said, "Oh, George took the keys and I'm following him to MD Anderson." (RR. XI – 46). Toney said, "Ana, why would you allow him to drive? Not only could he kill himself but someone else. Why would you allow this?" (RR. XI – 46). The appellant's response was silence (RR. XI – 46).

Blumenschein drove himself, slowly, to MD Anderson while the appellant followed him; she arrived about four minutes later (RR. VI – 105) (RR. IX – 282) (RR. XI – 49-50). When Toney got to the hospital, she saw the appellant arrive and said, "We need to get him to the ER now." (RR. XI – 49). But the appellant responded, "I don't know," before finally calling the emergency center (RR. XI – 49). It took them another twenty minutes to get to the emergency room (RR. XI –

16

55).  When they arrived, the appellant volunteered to fill out the paperwork for Toney (RR. XI – 55-56).

At the emergency room, Blumenschein was in and out of consciousness, stuporous, nonsensical, and groaning (RR. V – 195, 274) (RR. VI – 102) (RR. XI – 48).  He was also complaining about double vision (RR. VIII – 51).  Gilbert was paged to evaluate his cognitive functioning (RR. VI – 101-103, 107-108).  Blumenschein was very worried about a presentation that he had to give on Monday morning, but when his colleagues told him that someone else would handle it, he fell asleep (RR. IX – 284).  The appellant wrote an order of Tylenol for Blumenschein despite the fact that she was not his treating physician (RR. VI – 41).

Amit Lahoti, a nephrologist at MD Anderson, saw Blumenschein in the emergency room (RR. V – 268).  There was a severe amount of acid in Blumenschein's blood, which was already causing kidney problems, so Blumenschein was transferred to the Intensive Care Unit (ICU), and dialysis was started (RR. V – 198, 268-269, 274-277) (RR. VII – 112).  His creatinine levels hit 2.96 that morning, which indicated severe kidney damage (RR. V – 278).  That afternoon, a nurse pointed out Blumenschein's urine bag to Lahoti; there was an unusual whitish sediment in the bag (RR. V – 279).

Lahoti spun a sample from Blumenschein's urine bag in his centrifuge, checked it under a microscope, and was shocked to see crystals "everywhere" that were a telltale sign of ethylene glycol poisoning (RR. V – 279-280, 284, 286, 296) (RR. VI – 18) (RR. VII – 115) (St. Ex. 5, 6). Ethylene glycol, which can be found in antifreeze, breaks down into crystals that can be deposited into numerous organs, including the kidneys, causing inflammation (RR. V – 283-284, 289) (RR. VIII – 142-144). Those crystals can also be deposited in the brain, causing double vision (RR. VIII – 51, 142-144).

Ethylene glycol is a colorless, odorless substance with a sweet taste (RR. V – 309) (RR. VIII – 27). It would change the flavor of any food that it was added to, and Blumenschein described the appellant's coffee as "funny, or different" to a consulting physician (RR. VII – 22-23). Because it is an alcohol, ethylene glycol can cause intoxication (RR. VIII – 146). Furthermore, the continuous ingestion of a substantial amount of ethyl alcohol can delay the absorption of ethylene glycol because the body prefers to process ethyl alcohol rather than ethylene glycol (RR. III – 57-60).

When Lohati returned to Blumenschein's room with a picture of the crystals, the appellant said, "Oh, boy, looks like ethylene glycol. I've seen this quite a bit back home in my home country." (RR. V – 294). The appellant told Glisson that she had been reading about ethylene glycol poisoning and stated that

18

Blumenschein "must have been exposed in California then had alcohol during the trip back from San Diego and that that had delayed his presentation with clinical symptoms." (RR. VII – 116). She also told another of Blumenschein's colleagues that he was suffering from ethylene glycol poisoning and added, "And George is not the kind of person that would commit suicide." (RR. VI – 164).

Meric-Bernstam stopped by to check on Blumenschein (RR. V – 88-89). She could only see him from a distance, but he was pale and seemed unaware of his surroundings (RR. V – 89). The appellant talked with her there; she stated that she saw crystals in the Foley catheter that drains the bladder, that she was worried about that, and that it was being investigated by the nephrologist (RR. V – 90, 161, 199). The appellant suggested that Toney had done the poisoning (RR. V – 91). She also told Meric-Bernstam about the alleged attack near her mailbox the previous December (RR. V – 92).

The appellant told Glisson that Toney had a motive to poison Blumenschein because Toney had miscarried in the fall and the couple was still trying to have children (RR. VII – 121). That alleged motive made no sense to Glisson (RR. VII – 122). The appellant also admitted to Glisson that she had access to ethylene glycol in her laboratory (RR. VII – 124-125) (RR. IX – 28). But the appellant never told Glisson about the coffee she had made for Blumenschein the day he

19

became ill (RR. VII – 124, 162-163, 228, 265). She also denied having a sexual relationship with Blumenschein (RR. VII – 163).

The appellant continued to tell other coworkers of her suspicions that Toney was behind both the poisoning and the mailbox assault (RR. VII – 181-183) (RR. XII – 19-22). Sometimes in telling the mailbox story, the appellant would claim that it was two black males rather than a black male and a black female (RR. XII – 20). And she blamed Toney for allegedly forcing him away from his family (RR. VII – 190-192).

A day or so after Blumenschein was admitted to the hospital for the poisoning, the appellant sat down to talk with Litton (RR. XII – 69-71). She told Litton that Blumenschein was very sick, that he was poisoned with ethylene glycol, and that she was upset about the coffee that she gave him (RR. XII – 71). The appellant stated that Blumenschein was concerned that the coffee was too sweet and that she told him that she had put Splenda in it (RR. XII – 71). She also said that Blumenschein was confused and that she had to remind him that they were sipping out of the same to-go cup (RR. XII – 71-72). She admitted that she had ethylene glycol in her lab (RR. XII – 71). She said, "I'm going to get in so much trouble for this." (RR. XII – 71). Although the appellant was crying, she was being extremely careful about the words she chose to describe the situation (RR. XII –

74). She suggested that Toney was trying to frame her for the poisoning (RR. XII – 75).

Many labs at MD Anderson have open doors, and people can just walk in without using a security badge, especially by following someone else who had already used a badge to open the door (RR. V – 165-166) (RR. IX – 15-16) (RR. X – 160-161). And ethylene glycol would not commonly be locked up in a lab (RR. X – 161). Toney, on the other hand, had never purchased ethylene glycol (RR. XI – 96-97).

Blumenschein almost died as a result of the poisoning, and he would have died without the prompt medical treatment that he received (RR. V – 308) (RR. VI – 36, 112) (RR. IX – 287). He woke up on Tuesday in the ICU, saw Toney there, and asked what had happened (RR. IX – 285). Toney told him that he had been poisoned and that the appellant said that they found crystals (RR. IX – 285-286) (RR. XI – 64, 68). Blumenschein thought that the only odd food he had taken in the past few days was the appellant's abnormally sweet coffee (RR. IX – 286) (RR. X – 9) (RR. XI – 69-70).

Blumenschein did not immediately tell the police about his suspicions because he was still in the hospital and felt that both he and Toney were vulnerable, especially in light of the appellant's contacts in Columbia (RR. IX – 288) (RR. X – 10) (RR. XI – 69-70, 238). Blumenschein said to Toney, "Evette,

do not poke the dragon.…I think she poisoned me. I don't want to say anything until I know for certain, until we have some proof." (RR. XI – 70). He also said, "I'm in ICU. Please don't say anything.…I don't know if she's going to do something to you. I don't know if she's going to do something to me." (RR. XI – 71).

The first blood sample taken from Blumenschein was negative for ethylene glycol, but that was not surprising because that alcohol is quickly converted into acid (RR. V – 300) (RR. VI – 17-18) (RR. VII – 18-19). Nevertheless, the appellant sent an email to Lahoti on January 29 noting that the blood test for ethylene glycol was negative and asking what caused the damage to the kidneys (RR. V – 299-302). Lahoti, however, was confident in his diagnosis that Blumenschein suffered from ethylene glycol poisoning (RR. V – 303) (RR. VII – 17-18, 58-60, 129). And his diagnosis was confirmed by a professor of medical toxicology from the University of Texas Southwestern Medical Center and the North Texas Poison Center (RR. VIII – 8, 12, 18-56, 70). Furthermore, the timing of Blumenschein's intoxication symptoms was consistent with ingesting the ethylene glycol sometime Sunday morning (RR. VIII – 56-70). Kenneth McMartin, a professor of toxicology at Louisiana State University and the recognized authority on ethylene glycol toxicity, concurred in that conclusion (RR. VIII – 70, 129-135, 150-186, 217-218).

The appellant spoke with Kristen Price, a doctor who was investigating the possible source of the ethylene glycol poisoning, but she did not volunteer information, and she failed to mention anything that Blumenschein had to eat or drink with her, including the coffee (RR. VI – 30, 33). She did, however, say that Toney did not like her and did not like the fact that Blumenschein spent so much time with her (RR. VI – 32-34).

The appellant told Price that she wanted to speak confidentially (RR. VI – 34). She stated that she and Blumenschein "almost became romantically involved or had a sexual relationship," but she stopped it because she didn't think that would be wise with them working together (RR. VI – 34). A month or two later, the appellant told Price that Blumenschein had actually come to her apartment the morning before he got ill and that they had a shot of vodka; but she still failed to mention the coffee (RR. VI – 35, 45). The first time that Price heard about the coffee was in the media (RR. VI – 75).

While Blumenschein was still in the ICU, he received an angry text from the appellant (RR. IX – 290, 294). She was upset that she was going to be a suspect because she had access to ethylene glycol (RR. IX – 290). She was also focused on learning the location of the anonymous letter that Toney had received in the mail after Thanksgiving (RR. IX – 292). That letter was in the same bag as Blumenschein's laptop computer (RR. IX – 293) (RR. XI – 72). When

23

Blumenschein remarked that he needed his laptop computer, the appellant immediately volunteered to get it; however, when she delivered it to Blumenschein, the letter was missing from the bag (RR. IX – 193-194) (RR. XI – 72-76).

After Blumenschein had been in the ICU for a couple of weeks, the appellant told Toney that she wanted to travel with Blumenschein to Italy (RR. XI – 78). She stated, "I have shared hotel rooms with him several times and I want to travel with him and take care of him." (RR. XI – 79). Hearing this prompted Toney to confront Blumenschein again about his affair with the appellant, and this time he finally admitted to it; Toney cried (RR. IX – 290-291) (RR. XI – 80). Toney then confronted the appellant, who also admitted to the affair (RR. XI – 83). She said, "That was just sex, Evette." (RR. XI – 84). Regarding the poisoning, the appellant said that she spoke with her brother about the attack, that he was going to come from Colombia, that she was going to take care of matters, and that she decided not to do that (RR. XI – 84).

Price eventually contacted the chief at the University of Texas Police Department (UTPD) in MD Anderson as well as the chief legal counsel for the hospital (RR. VI – 38). Macario Sosa with the UTPD was assigned to the case (RR. VIII – 229-230). He interviewed Price, Eng, Toney, Lahoti, and others (RR. VIII – 229, 237, 259-260, 292) (RR. IX – 25). He tried to meet with

Blumenschein, but Blumenschein was still in the ICU and was in a lot of pain (RR. VIII – 240, 242). He arranged to meet with the appellant on January 31, but the appellant called and cancelled because she was flying to Chicago (RR. VIII – 233-235). He made another appointment to meet with her on February 1, but she cancelled that meeting as well (RR. VIII – 236-237). He was eventually able to talk with her on February 26 (RR. VIII – 237). In the meantime, he pulled the MD Anderson emails for the appellant and Blumenschein (RR. VIII – 240).

Blumenschein was discharged from the hospital on February 22 (RR. IX – 295). The appellant offered to have Blumenschein and Toney stay with her during his recuperation so that she could give him IV fluids, but he declined (RR. VII – 184-187) (RR. IX – 295). He had lost a lot of muscle mass, and it was very difficult for him to keep his blood pressure up (RR. IX – 297). The damage to his kidneys caused long-term physical disabilities, limiting his diet and activity and reducing his life expectancy (RR. VII – 26-28) (RR. X – 27) (RR. XII – 30). His kidneys function at about forty percent of what they should (RR. X – 29). He is required to be a vegetarian, does not drink alcohol, and becomes fatigued easily (RR. VII – 25-28, 39) (RR. X – 27-28).

The appellant's friends decided that they no longer wanted to be alone with the appellant to avoid talking about Blumenschein and Toney (RR. VII – 271-272, 302). They compared notes and realized that the appellant was telling the same

25

basic stories but with different details (RR. XII – 76). Litton felt that the appellant was manipulating her (RR. XII – 76).

The appellant told Price about the alleged assault that occurred near her mailbox, although in this version it was two men; she also stated that the assault had been traced to Toney by a private investigator (RR. VI – 43-45). And she told Price that she was worried about Blumenschein's possible conflict of interest because Toney worked for GlaxoSmithKline, and Blumenschein had a research grant from that company (RR. VI – 47-50) (RR. VII – 197-198, 265-266).

The appellant and Gilbert were at a conference in San Francisco in March or April, and they went out to dinner together (RR. VI – 112). The topic of Blumenschein's poisoning came up, and the appellant suggested that Toney was possibly the poisoner (RR. VI – 114).

Also in March, Blumenschein was supposed to attend a conference in Italy and was planning on taking Toney (RR. X – 14-16) (RR. XI – 89). The appellant repeatedly offered to come to Italy to take care of him and his IV fluids, but he rejected her assistance (RR. X – 16). She then told him that she had looked into his United Airlines account and knew that he was taking Toney on the trip (RR. X – 16) (RR. XI – 89). Blumenschein did not know how the appellant had acquired the password to his United Airlines account, and he had to change it (RR. X – 16).

On March 17, the appellant sent Blumenschein an angry email regarding a prior email that Blumenschein had never sent (RR. IX – 297). His technology department concluded that someone had been messing around with his email account (RR. VII – 297-298) (RR. IX – 298, 300). The appellant had acquired the password to his email account, and she downloaded a picture of Toney from his email (RR. VII – 274) (RR. IX – 296). On another occasion, one of the appellant's hotel reservations was cancelled without his consent (RR. XII – 32-34). The appellant told coworkers that she and Blumenschein shared email passwords because of their work partnership (RR. VII – 275).

In order to protect themselves in light of the curious circumstances, Blumenschein and Toney bought a recording device and learned how to use it (RR. IX – 307-308). He recorded several of his telephone calls with the appellant (RR. IX – 309). In one of the recordings, the appellant told Blumenschein that she had come home from a foreign conference to find an anonymous letter on her front porch that had been exposed to the sprinkler system (RR. X – 19). She stated that the letter said something like, "You finally left him alone, good." (RR. X – 19). Blumenschein told the appellant to give the letter to the police because it was a break in the case, and they discussed the letter several times (RR. X – 19). But the appellant eventually admitted that she had fabricated the letter (RR. X – 19, 21).

In early April 2013, an anonymous letter was dropped off to MD Anderson's conflict-of-interest chair regarding Blumenschein's grant from GlaxoSmithKline and Toney's employment with that same company (RR. VII – 266) (RR. VIII – 277-284) (RR. X – 142-143). That letter contained the same misspelling of the appellant's name that had been in the earlier Thanksgiving 2012 note addressed to Toney (RR. VIII – 284). The appellant denied writing that anonymous letter (RR. VII – 266-268). But surveillance video showed her at the conflict-of-interest office at the time that the letter was delivered (RR. VII – 289-291).

On April 18, a conflict-of-interest board member received an anonymous email reporting Blumenschein's alleged marriage to Toney and pointing her out as a GlaxoSmithKline employee (RR. X – 138-140). The email referred to the appellant and misspelled her first name in the same manner as was done in the prior anonymous letters (RR. X – 140-141). The email also referred to an upcoming ASCO conference, which meant that the author knew a lot about Blumenschein and his schedule (RR. X – 141-142). That board member talked with the appellant, who was very eager to assist (RR. X – 145-147). She stated that she had tried several times to discuss the issue with Blumenschein and that she was unable to effect any outcome; she also forwarded several emails in that regard (RR. X – 145-147). She told the board member that Toney had filled out

documents in the emergency room indicating that she was Blumenschein's spouse (RR. X – 154).

A similar anonymous letter regarding the alleged conflict of interest was sent to GlaxoSmithKline (RR. X – 185-188). The letter detailed numerous alleged violations by Toney, including using a GlaxoSmithKline conference line to receive personal coaching from physicians and using the appellant's fraudulent doctor's note as an excuse after the crash of the company car (RR. X – 187-188). The letter misspelled Blumenschein's name as "Blumenschain." (RR. X – 207-208).

Mike DeSilva, an investigator with GlaxoSmithKline was assigned to look into the allegations in the letter (RR. X – 188-189). While he was conducting the investigation, he received two anonymous phone calls from a woman with a Hispanic accent, who he later identified as the appellant (RR. X – 196, 201). He talked with the appellant for approximately ten minutes during the first call, which occurred on April 30, and over thirty minutes during the second call, which occurred on May 1 (RR. X – 195, 201). The appellant stated that she worked with Blumenschein at MD Anderson and that it was very important to her that Blumenschein not be made aware that she had reported the conflict of interest allegation involving him and Evette Toney (RR. X – 204). The appellant reported that during Blumenschein's recent hospitalization Toney had told hospital personnel that she was his common-law spouse (RR. X – 205).

DeSilva set up an anonymous email account for the appellant so that he could continue to communicate with her (RR. X – 205-206). During an email exchange on May 5, the appellant referred to herself as "your doctor contact at MD Anderson" and then directed DeSilva to contact the appellant herself through her MD Anderson email account (RR. X – 207) (St. Ex. 138). That email also misspelled Blumenschein's name as "Blumenschain." (RR. X – 207-208). In another email dated May 8, the appellant once again referred DeSilva to herself and stated:

> Gonzalez is very close to Blumenschein. They work together, and are close friends. However, we are sure that she will answer any questions that you have, and if she is asked to keep the investigation confidential, she will (one of us asked her through a private e-mail account anonymously)…. She answered that she will be willing to answer any questions via e-mail and by a phone call if necessary, but she would need to have MD Anderson Compliance Officer present. …

> Since this is getting much more complex and involves other information, we believe that we should not get further involved. We have contacted Gonzalez for you. E-mail her. E-mail or call the other people we told you, they will tell you the truth. Compliance either has called them or will call them.

(RR. X – 209-210, 211) (St. Ex. 139). On May 9, the appellant wrote, "Gonzalez will help you out. We are from nieghborh [sic] countries and we were raised the same way. She will do the right thing." (RR. X – 212) (St. Ex. 141). DeSilva emailed the appellant through her MD Anderson account and attempted to set up a meeting, but the appellant was unwilling to meet personally and would only

30

communicate through email (RR. X – 213-215). The appellant, however, never answered DeSilva's emailed list of questions (RR. X – 217-219). Toney was fired by GlaxoSmithKline as a result of using the appellant's false doctor's note (RR. X – 220-221, 274) (RR. XI – 90-93).

Sosa obtained a warrant for the appellant's arrest on May 29, 2013 (RR. VII – 299-304) (CR – 8-9, 19). He could not obtain a statement from the appellant because she already had legal counsel (RR. IX – 32). But the appellant told Sosa that it was Evette (RR. IX – 37). When Sosa said, "You can't beat science," the appellant responded, "Yes, science is good." (RR. IX – 37). She appeared defeated at that point (RR. IX – 38).

A month or so before the trial, the appellant warned her friends that she was probably going to sue MD Anderson and some of the other people that had "hurt her throughout this process." (RR. VII – 304). She also stated that her criminal lawyers were going to be very hard on some witnesses, especially those who had allegedly lied before the Grand Jury, despite the fact that such testimony is supposed to be confidential (RR. VII – 305-306).

## REPLY TO APPELLANT'S SECOND AND THIRD
## POINTS OF ERROR

The appellant claims in her second point of error that the evidence was insufficient to connect her to the injuries sustained by Blumenschein (App'nt Brf. 32-42). Her related third point of error argues that the evidence was insufficient to show that she was in a dating relationship with him (App'nt Brf. 43-47). These issues will be addressed first because sufficiency of the evidence is in many ways the most basic argument that can be made in a case, and because a discussion of the evidence is relevant to any harm analysis performed in the other points of error. Nevertheless, these issues lacks merit because any rational jury could have found the appellant guilty based on the mountain of testimonial and circumstantial evidence.

> **A rational jury could have found beyond a reasonable doubt that the appellant committed the aggravated assault of a person with whom she had been in a dating relationship.**

The standard of review in the present case is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that the appellant intentionally caused serious bodily injury to Blumenschein by poisoning him with ethylene glycol and that she had been in a dating relationship with him (CR – 23); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Brooks v. State*, 323 S.W.3d 893, 902 (Tex. Crim. App.

2010); TEX. PENAL CODE § 22.02(b)(1) (West 2010). The jury is the sole judge of the weight of the evidence under this review and may choose to believe all, some, or none of it. *Chambers v. State*, 805 S.W.2d 459, 461 (Tex. Crim. App. 1991).

"Serious bodily injury" means bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ. TEX. PENAL CODE § 1.07 (West 2010). A "dating relationship" means a relationship between individuals who have or have had a continuing relationship of a "romantic or intimate nature." TEX. FAMILY CODE § 71.0021(b) (West 2010). The existence of such a relationship must be determined based on the length of the relationship, the nature of the relationship, and the frequency and type of interaction between the persons involved in the relationship. *Id.*. But a "casual acquaintanceship" or "ordinary fraternization" in a business or social context does not constitute such a relationship. TEX. FAMILY CODE § 71.0021(c) (West 2010).

Evidence can be legally sufficient for a conviction even if it is entirely circumstantial. *King v. State*, 29 S.W.3d 556, 565 (Tex. Crim. App. 2000). The standard of review for circumstantial and direct evidence is the same. *Id.* It is not necessary that every fact point directly and independently to the defendant's guilt; it is enough if the conclusion is warranted by the combined and cumulative force

33

of all the incriminating circumstances. *Johnson v. State*, 871 S.W.2d 183, 186 (Tex. Crim. App. 1993).

In the present case, the evidence showed that the appellant and Blumenschein started having sex in 2011 and continued to have sex until the day she poisoned him in 2013 (RR. IX – 163-164, 253-256). The appellant would frequently give him expensive gifts, she offered to have his child, she named him in her will, and they took frequent trips together, sometimes sharing a hotel room (RR. VII – 299-301) (RR. IX – 162-169, 176-179) (RR. X – 12-13, 26, 274-275) (RR. XI – 79). Furthermore, the appellant admitted to the affair on more than one occasion (RR. XII – 54) (RR. XI – 83). While Blumenschein did not consider the appellant to be his girlfriend or that they were dating, he conceded that they had an intimate relationship (RR. IX – 163, 166-167, 169-170, 176, 193, 218) (RR. X – 43-44). Thus, the evidence was sufficient to show intimacy if not true romance. TEX. FAMILY CODE § 71.0021(b) (West 2010).

With regard to the poisoning, the appellant herself acknowledged the numerous connections. She told her good friend Litton, "I'm going to get in so much trouble for this," because she gave Blumenschein the sweet coffee the day he became ill and because she had access to ethylene glycol in her lab (RR. XII – 71). Her escalating desperate behavior prior to the poisoning showed her willingness to break the law, by stalking and making false statements to law enforcement among

34

other activities, in order to harm Blumenschein's relationship with Toney (RR. IX – 211-235). Her behavior during the day of the poisoning showed her intent to isolate Blumenschein and prevent him from getting the medical help that he needed (RR. V – 192, 226) (RR. IX – 279-282) (RR. XI – 42-43, 46-49). And her behavior during Blumenschein's hospitalization showed her intent to deflect suspicions onto Toney and away from herself (RR. V – 91, 299-302) (RR. VI – 32-34, 164) (RR. VII – 116, 121, 181-183) (RR. XII – 19-22, 75).

From the above evidence, any jury would have been rationally justified in finding guilt beyond a reasonable doubt. *See Palomo v. State*, 352 S.W.3d 87, 90 (Tex. App.—Houston [14th Dist.] 2011, pet. ref'd) (holding that defendant's possession of a weapon linked to the crime soon after the crime and the defendant's having access to the location where the police discovered the weapon was a circumstance of the defendant's guilt); *Huffman v. State*, 775 S.W.2d 653, 661 (Tex. App.—El Paso 1989, pet. ref'd) (holding in a murder case based on circumstantial evidence and involving ligature strangulation, defendant's access to a belt which gave him the capacity to inflict the fatal injuries was evidence of guilt where a belt was found near the victim's bed even though it was not conclusively shown to be murder weapon,); *Halton v. State*, 05-14-00640-CR, 2015 WL 3991827, at *5 (Tex. App.—Dallas July 1, 2015, no pet.) (not designated for publication) (finding evidence sufficient to show a dating relationship even though

victim denied having sexual relations with Halton and testified she does not consider a relationship without sex "dating intimately," where victim also testified that they shared companionship and kissed).

The appellant claims that Blumenschein "told investigators and physicians that [the appellant] drank the same coffee from the same cup he did throughout the day." (App'nt Brf. 35). But in the same passage cited by the appellant, Blumenschein stated that his memory was "very foggy" and that he was on pain medications at the time (RR. X – 65-66). Moreover, Blumenschein's previous testimony at trial was that the appellant "held it up to her lips and said, It's Splenda. I couldn't tell if she drank or not. I didn't see her swallow." (RR. IX – 259). He also affirmed that he "never actually saw her take a sip." (RR. IX – 259). Furthermore, any statements to the contrary could have been the result of the appellant's power of suggestion. The appellant admitted to Litton that Blumenschein was confused and she had to "remind him" that they were sipping out of the same to-go cup (RR. XII – 71-72). Finally, even if the testimony cited by the appellant were the only testimony on the issue in the appellate record, the jury could have chosen to disbelieve it; therefore, it should not be considered under the correct standard for evaluating the sufficiency of the evidence. *See Jackson*, 443 U.S. at 319 (requiring that evidence be viewed in the light most favorable to the prosecution).

The appellant argues that no ethylene glycol was found in her possession. (App'nt Brf. 35). But she admitted that she had access to the poison (RR. VII – 124-125) (RR. IX – 28). She was a smart woman. And she had all the time she needed to dispose of the physical evidence after Blumenschein was admitted to the hospital and she realized that she would be a suspect. The appellant states without citation to the record that the "evidence conclusively showed every physician at M.D. Anderson had as much access to ethylene glycol as she did." (App'nt Brf. 35-36). But that evidence came from the appellant's mouth, when she was trying to manipulate her friend, Litton (RR. XII – 71). And once again, evidence favorable to an appellant cannot "conclusively show" anything in a sufficiency review because the standard requires that the evidence be viewed in the light most favorable to the prosecution. *See Jackson*, 443 U.S. at 319.

The appellant claims that the "window of possible ingestion realistically extended as far back as the previous Friday night." (App'nt Brf. 36). But there was nothing at all realistic about that scenario. As the foremost authority on ethylene glycol poisoning explained in detail, such a scenario would have required that Blumenschein continuously keep his blood alcohol level at 0.10 to 0.15 during that period (RR. VIII – 57-68). And that would have required that he consume approximately three liters of booze each day, continuously (RR. VIII – 61-62). There was no realistic evidence that such a scenario was occurring.

37

The appellant argues that the "fatal attraction" theory "has no logical force and is hard to square with a lovelorn woman set on winning the complainant." (App'nt Brf. 37). But there is an oft-quoted proverb to the contrary: "Heaven hath no rage, like love to hatred turned, Nor hell a fury like a [lover] scorned." WILLIAM CONGREVE, THE MOURNING BRIDE, act 3, sc.8. The appellant had spent so much time, money, and energy in her efforts to woo Blumenschein, that she was understandably reduced to rage when Blumenschein announced that he was still pursuing a baby with Toney and was even thinking of marrying her (RR. VII – 198) (RR. IX – 234-235). Not only did the appellant's motive have overwhelming logical force, it was one of the oldest motives in the book.

The appellant cites *Stobaugh v. State*, 421 S.W.3d 787, 790 (Tex. App.— Fort Worth 2014), *petition refused*, 455 S.W.3d 165 (Tex. Crim. App. 2015), in support of her claim that the circumstantial evidence was insufficient. But *Stobaugh* was a 47,000 word opinion holding the evidence insufficient to prove murder in that case where "there is no body, no murder weapon, no witnesses, no blood or DNA evidence; there are no fibers, hairs, or any type of forensic evidence establishing that a murder occurred." *Id*., 421 S.W.3d at 865. The sheer length of the opinion demonstrates how fact-bound the holding was. Furthermore, in the present case, there was overwhelming evidence that a poisoning had occurred. Blumenschein survived the assault and was able to testify about his injuries and the

38

sweet coffee. And three irreproachable experts agreed that Blumenschein's injuries were caused by ethylene glycol poisoning, which most likely occurred around the time that Blumenschein drank the appellant's sweet coffee (RR. V – 303) (RR. VII – 17-18, 58-60, 129) (RR. VIII – 8, 12, 18-70, 129-135, 150-186, 217-218).

The appellant claims that it "strains credibility to believe that [Blumenschein] would drink something he found sickening, disgusting and perhaps even toxic because he did not want to hurt the feelings of someone he had been using for casual sex at the office over the previous two years." (App'nt Brf. 41). But of course, their relationship was far more complex than that. The appellant and Blumenschein had worked closely together for years and had been in an intimate relationship for almost as long (RR. VII – 299-301) (RR. IX – 162-169, 176-179, 253-256) (RR. X – 12-13, 26, 274-275) (RR. XI – 79, 83) (RR. XII – 54). Furthermore, Blumenschein stated that the appellant was not someone who would take "no" for an answer (RR. IX – 251). The appellant was the driving force behind the relationship: she initiated their first contact and orchestrated every major advance in intimacy (RR. IX – 148, 156, 159-160, 162-169). Thus, the appellant's characterization of the relationship is not supported by the evidence.

The appellant claims that the evidence of a dating relationship was insufficient because Blumenschein and the appellant both stated at times that it was

casual sex. (App'nt Brf. 44-45). But the appellant's claim of casual sex was made to Toney when she was finally confronted about the affair; therefore, she had a motive to downplay it. The appellant made crystal clear to her friends and coworkers, through both her actions and her statements, that she was far more emotionally invested in Blumenschein than mere casual sex. She offered to have his baby, she told people that she cared for him and that he was good to her, and she bought him many expensive gifts (RR. VII – 176, 230, 237-239) (RR. IX – 166, 176-179) (RR. X – 274-275).

Both Blumenschein and the appellant admitted to Toney that they were having an "affair." (RR. XI – 80, 83). These admissions, coupled with the evidence that the affair included repeated sexual relations, travel together, and gift exchanges, was sufficient evidence to meet the broad definition of a "dating relationship." TEX. FAMILY CODE § 71.0021(b) (West 2010) ("a relationship between individuals who have or have had a continuing relationship of a romantic or intimate nature."). Furthermore, as stated previously, the jury could easily have dismissed all evidence to the contrary as lacking credibility. *See Jackson*, 443 U.S. at 319 (requiring that evidence be viewed in the light most favorable to the prosecution). Thus, the evidence was sufficient to sustain the conviction, and the appellant's second and third points of error should be overruled.

## REPLY TO APPELLANT'S FIRST POINT OF ERROR

In her first point of error, the appellant complains that the trial court erred in failing to grant her motion for new trial based on alleged "newly discovered evidence" that rebutted the "fatal attraction" theory. (App'nt Brf. 11). This claim lacks merit because the trial court could have disbelieved the new evidence and believed Blumenschein's affidavit, which contradicted much of the allegedly new evidence.

The appellant filed a motion for new trial thirty days after judgment was entered in the case (CR – 168). The motion alleged that "Mary Kara Bucci had direct and personal knowledge of evidence favorable to the accused, which she withheld prior to trial, despite the attempts of the defense team to discover it." (CR – 169). Bucci's affidavit stated that she had an "occasionally romantic or intimate" relationship with Blumenschein for 3.5 years starting in 2006 (CR – 179). She also stated that she saw Blumenschein in Alaska in 2012 and that he stated then that he and Toney were no longer seeing each other (CR – 179).

The State filed a response to the appellant's motion for new trial, and Blumenschein submitted an affidavit to "correct some of the misstatements" in Bucci's affidavit (CR – 190-194). Blumenschein affirmed that he and Bucci "engaged in oral sex on two or three occasions over the next several months" in June 2009 after Toney had moved out of his house, but he denied an ongoing

romantic relationship starting in 2006 (CR – 192). He confirmed that he spoke with Bucci in Alaska in 2012 but denied saying anything about his relationship with Toney being over (CR – 193-194). The trial court held a hearing on the appellant's motion for new trial and denied the motion on December 8, 2014 (CR – 176, 208).

A trial court's decision whether to grant a new trial based on newly discovered evidence is reviewed for an abuse of discretion. *See Keeter v. State*, 74 S.W.3d 31, 37 (Tex. Crim. App. 2002); *see also Colyer v. State*, 428 S.W.3d 117, 122 (Tex. Crim. App. 2014). Under the abuse-of-discretion standard, this Court must view the evidence in the light most favorable to the trial court's ruling and uphold the trial court's ruling if it is within the zone of reasonable disagreement. *Webb v. State*, 232 S.W.3d 109, 110 (Tex. Crim. App. 2007). This Court cannot substitute its judgment for that of the trial court, but instead must consider whether the trial court's decision was arbitrary or unreasonable. *Id.*; *Holden v. State*, 201 S.W.3d 761, 763 (Tex. Crim. App. 2006). A trial court abuses its discretion in denying a motion for new trial when no reasonable view of the record could support its ruling. *Colyer*, 428 S.W.3d at 122.

**The trial court did not abuse its discretion in denying the appellant's motion for new trial based on alleged newly discovered evidence because it could have disbelieved the new evidence and believed Blumenschein's affidavit, which contradicted much of the allegedly new evidence.**

"The trial court, as factfinder, is the sole judge of witness credibility at a hearing on a motion for new trial with respect to both live testimony and affidavits." *Okonkwo v. State*, 398 S.W.3d 689, 694 (Tex. Crim. App. 2013). If there is conflicting evidence on an issue of fact, the trial judge determines the issue and there is no abuse of discretion in overruling the motion for new trial. *Lewis v. State*, 911 S.W.2d 1, 7 (Tex. Crim. App. 1995).

The Code of Criminal Procedure provides that a new trial "shall be granted to an accused where material evidence favorable to the accused has been discovered since trial." TEX. CODE CRIM. PROC. art. 40.001 (West 2012). Under this provision, a defendant is entitled to a new trial if (1) the newly discovered evidence was unknown or unavailable to the movant at the time of his trial; (2) the movant's failure to discover or obtain the evidence was not due to his lack of diligence; (3) the evidence is admissible and is not merely cumulative, corroborative, collateral, or impeaching; and (4) the new evidence is probably true and will probably bring about a different result on another trial. *Wallace v. State*, 106 S.W.3d 103, 108 (Tex. Crim. App. 2003).

In the present case, the appellant has failed to establish both the third and fourth requirements for a new trial. The appellant cannot show that the evidence was admissible because it was irrelevant. Relevant evidence is defined as evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." TEX. R. EVID. 401. And whether Blumenschein had an affair with Bucci does not make it more or less probable that he was poisoned by the appellant. Furthermore, to the extent that Blumenschein's infidelity to Toney was relevant, any evidence of an additional affair with Bucci would have been merely cumulative, corroborative, collateral, or impeaching.

The appellant claims that the evidence of the affair with Bucci showed that Blumenschein "may have targeted [the appellant] for sexual harassment as early as 2008." (App'nt Brf. 25). But while sexual harassment may form the basis for a civil action, it does not constitute a defense to attempted murder. Moreover, the trial court, as the finder of fact, could have completely disbelieved the allegations in Bucci's affidavit, especially when confronted by the contradictory averments in Blumenschein's affidavit. *Compare* (CR – 178-179) *with* (CR – 192-194).

The appellant argues that painting Blumenschein as a predator who targeted younger female colleagues "would have refuted the State's implications about motive and opportunity." (App'nt Brf. 26). To the contrary, it would only have

provided additional evidence of yet another motive for the appellant to seek her revenge on Blumenschein. If the appellant's hostility toward Blumenschein was born out of her playing the part of the scorned lover, that hostility would only be greater if she also saw Blumenschein as the initial instigator of their intimate and romantic relationship.

The appellant has also failed to show that the allegedly new evidence was probably true and that it would probably bring about a different result at a new trial. Bucci's affidavit did not squarely address any of the elements of the alleged offense. The allegations in the affidavit dealt with specific tangential issues regarding Blumenschein's romantic affairs. But the fact that Blumenschein had numerous romantic affairs was not a contested issue at trial. In fact, according to the State's final argument, the admission of such an affair was central in establishing one of the appellant's motives (RR. XII – 197, 202). Furthermore, Blumenschein filed an affidavit denying or disputing many of Bucci's allegations in her affidavit. And the trial court was entitled to believe Blumenschein's affidavit. *See Okonkwo*, 398 S.W.3d at 694; *Lewis*, 911 S.W.2d at 7.

The appellant claims that Bucci had "no motivation to lie" and made the affidavit "at personal risk to her own reputation and privacy." (App'nt Brf. 27). But if her implicit allegations of Blumenschein being a predator who targeted younger female colleagues were true, then she would have had the same

45

motivations as the appellant to get her revenge on him. Furthermore, the appellant has failed to show how making the affidavit exposed her to any personal risk. There was no evidence of Blumenschein threatening anyone in such a manner. Furthermore, it is difficult to imagine any damage that could be done to Bucci's reputation or privacy in Palmer, Alaska, where she now practices, as a result of filing her affidavit back in Houston, Texas.

The appellant claims that Blumenschein "expressly admitted to lying extensively about his private life while he was on the stand during trial." (App'nt Brf. 31). To be clear, Blumenschein did not admit that his trial testimony was a lie; rather, he admitted to lying to Glisson and others when they asked about his private romantic affairs (RR. X – 119-120). Lying to a coworker about a private matter is a completely different act than lying under oath while testifying at trial or while swearing to an affidavit. *See* TEX. PENAL CODE § 37.02 (West 2012) ("A person commits an offense if, with intent to deceive and with knowledge of the statement's meaning: (1) he makes a false statement under oath or swears to the truth of a false statement previously made and the statement is required or authorized by law to be made under oath."). And the trial court was entitled to consider that difference in its ruling. Therefore, the trial court did not abuse its discretion in denying the appellant's motion for new trial.

Finally, as stated previously in response to the appellant's second and third points of error, the evidence of the appellant's guilt was overwhelmingly strong. There was evidence from numerous sources that Blumenschein and the appellant were intimate with each other, that the appellant would frequently give him expensive gifts, that she offered to have his child, that she named him in her will, and that they took frequent trips together, sometimes sharing a hotel room (RR. VII – 299-301) (RR. IX – 162-169, 176-179) (RR. X – 12-13, 26, 274-275) (RR. XI – 79). Furthermore, the appellant admitted to the affair on more than one occasion (RR. XII – 54) (RR. XI – 83). And she admitted to a friend that she would get in trouble for the poisoning because she gave Blumenschein the sweet coffee the day he became ill and because she had access to ethylene glycol in her lab (RR. XII – 71). Thus, any additional evidence concerning another of Blumenschein's affairs would not likely have changed the outcome of the trial. *See Wallace*, 106 S.W.3d at 108 (holding that trial court does not abuse its discretion in denying a new trial when the prosecution's case was strong enough that the new evidence suggested by the affidavits, even if true, would probably not be so compelling as to bring about a different result in a new trial). The trial court did not abuse its discretion in denying the motion for new trial, and the appellant's first point of error should be overruled.

## REPLY TO APPELLANT'S FOURTH POINT OF ERROR

In her fourth and final point of error, the appellant complains about DeSilva's identification of her voice in her two anonymous telephone calls to GlaxoSmithKline. (App'nt Brf. 48-61). This argument fails because DeSilva had a strong basis for identifying the appellant and there were numerous pieces of evidence to connect the appellant to the anonymous GlaxoSmithKline caller even without DeSilva's identification. Furthermore, the appellant was not harmed by the admission of the voice identification, which related to a collateral issue in the case.

The trial court's ruling on the admissibility of evidence is subject to an abuse of discretion standard on appeal. *See Coffin v. State*, 885 S.W.2d 140, 149 (Tex. Crim. App. 1994). A reviewing court should not reverse a trial judge whose ruling was within the "zone of reasonable disagreement." *Green v. State*, 934 S.W.2d 92, 101 (Tex. Crim. App. 1996). The reviewing court must view the evidence in the light most favorable to the trial court's ruling, giving the trial court almost total deference on its findings of historical fact that are supported by the record. *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997).

**A. DeSilva had a strong basis for identifying the appellant and there were numerous pieces of evidence to connect the appellant to the anonymous GlaxoSmithKline caller even without DeSilva's identification.**

"[A] pretrial identification procedure may be so suggestive and conducive to mistaken identification that subsequent use of that identification at trial would deny the accused due process of law." *Conner v. State*, 67 S.W.3d 192, 200 (Tex. Crim. App. 2001). To determine the admissibility of a pretrial identification, this Court must use a two-step analysis asking (1) whether the pretrial procedure was impermissibly suggestive; and (2) if so, whether the suggestive pretrial procedure gave rise to a very substantial likelihood of irreparable misidentification. *Santos v. State*, 116 S.W.3d 447, 455 (Tex. App.—Houston [14th Dist.] 2003, pet. ref'd); *see also Neil v. Biggers*, 409 U.S. 188, 198 (1972); *Aviles-Barroso v. State*, 14-14-00142-CR, 2015 WL 5157472, at *12 (Tex. App.—Houston [14th Dist.] Aug. 27, 2015, no. pet. h.). An analysis under these steps requires an examination of the totality of the circumstances surrounding the particular case and a determination of the reliability of the identification. *Conner*, 67 S.W.3d at 200; *Barley v. State*, 906 S.W.2d 27, 33 (Tex. Crim. App. 1995). A defendant must prove the pre-trial identification is unreliable by proving both elements by clear and convincing evidence. *See Santos*, 116 S.W.3d at 451.

If the indicia of reliability outweigh the influence of an impermissibly suggestive pretrial identification, then the identification testimony is admissible.

*Santos*, 116 S.W.3d at 451, 455–56; *see Neil*, 409 U.S. at 199. Therefore, even if the pretrial procedure is found to be impermissibly suggestive, identification testimony nevertheless is admissible if the totality of the circumstances shows no substantial likelihood of irreparable misidentification. *See Ibarra v. State*, 11 S.W.3d 189, 195 (Tex. Crim. App. 1999); *Adams v. State*, 397 S.W.3d 760, 764 (Tex. App.—Houston [14th Dist.] 2013, no pet.). If the totality of the circumstances indicates that a substantial likelihood of misidentification exists, then admission of the identification of the defendant amounts to a denial of due process. *See Neil*, 409 U.S. at 198–99; *Adams*, 397 S.W.3d at 764.

The analysis of an identification of a voice differs somewhat from that of an identification by sight, but the standards used to validate a visual identification are applicable. *Aviles-Barroso*, 2015 WL 5157472, at \*12; *see also Davis v. State*, 180 S.W.3d 277, 283 (Tex.App.—Texarkana 2005, no pet.) (analyzing admissibility of voice identification); *Williams v. State*, 116 S.W.3d 788, 792 (Tex. Crim. App. 2003) ("'while one's voice and handwriting are, of course, means of communication,' a voice or handwriting exemplar 'is an identifying physical characteristic.'").

In determining whether an impermissibly suggestive identification procedure gave rise to a substantial likelihood of irreparable misidentification, this Court must weigh the following factors: (1) the witness's opportunity to hear the

50

criminal; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal's voice; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the initial contact and the confrontation. *See Neil*, 409 U.S. at 199; *Santos*, 116 S.W.3d at 453, 455–56; *Aviles-Barroso*, 2015 WL 5157472, at *16. Because these factors are issues of historical fact, this Court must weigh them deferentially in a light favorable to the trial court's ruling. *See Ibarra*, 11 S.W.3d at 195–96; *Adams*, 397 S.W.3d at 764.

In the present case, there were numerous pieces of evidence to connect the appellant to the anonymous GlaxoSmithKline caller even without DeSilva's identification. An anonymous letter was dropped off to MD Anderson's conflict-of-interest chair regarding the GlaxoSmithKline issue in early April 2013 (RR. VII – 266) (RR. VIII – 277-284) (RR. X – 142-143). The appellant denied writing that anonymous letter, but surveillance video showed her at the conflict-of-interest office at the time that the letter was delivered (RR. VII – 266-268, 289-291). On April 18, a conflict-of-interest board member received an anonymous email reporting the same GlaxoSmithKline issue (RR. X – 138-140). The email referred to the appellant and misspelled her first name in the same manner as was done in the prior anonymous letter and referred to an upcoming ASCO conference, which meant that the author knew a lot about Blumenschein and his schedule, as the

appellant did (RR. X – 140-142). A similar anonymous letter regarding the alleged conflict of interest was also sent to GlaxoSmithKline and included the allegation that Toney used the appellant's fabricated doctor's note as an excuse after the crash of the company car (RR. X – 185-188).

While DeSilva was conducting an investigation of the letter, he received two anonymous phone calls from a woman with a Hispanic accent (RR. X – 196, 201). He talked with the woman for approximately ten minutes during the first call, which occurred on April 30, and over thirty minutes during the second call, which occurred on May 1 (RR. X – 195, 201). The woman with the Hispanic accent stated that she worked with Blumenschein at MD Anderson and that it was very important to her that Blumenschein not be made aware that she had reported the conflict of interest allegation involving him and Evette Toney (RR. X – 204). She reported that during Blumenschein's recent hospitalization Toney had told hospital personnel that she was his common-law spouse, while the appellant was the one who had filled out the hospital paperwork (RR. X – 205) (RR. XI – 55-56). DeSilva set up an anonymous email account for the caller so that he could continue to communicate with her, and she identified herself as "your doctor contact at MD Anderson" and then directed DeSilva to contact the appellant through her MD Anderson email account (RR. X – 207, 209-210, 211) (St. Ex. 139). DeSilva emailed the appellant and attempted to set up a meeting, but the appellant was

unwilling to meet personally and would only communicate through email (RR. X – 213-215). Thus, there was strong circumstantial evidence that the appellant was the anonymous caller to GlaxoSmithKline even without DeSilva's identification of her voice.

With regard to the identification itself, DeSilva had a strong basis for identifying the appellant. He spoke with her during the course of two phone conversations lasting more than forty minutes total (RR. X – 195, 201). Furthermore, DeSilva was not your average citizen; he was a trained investigator with 22 years of experience in law enforcement (RR. X – 184). Thus, his powers of perception and memory were likely more developed than other listeners, especially since he was conducting an active investigation on the issue. He conducted the identification after listening to Blumenschein's telephone recordings of the appellant, so the context of the voice was the same (RR. IX – 309) (RR. X – 196, 199, 200-203) (St. Ex. 127). And Blumenschein made six hours of such recordings, so there was also a sufficient sample size of the appellant's known voice for DeSilva to use as a basis for the identification (RR. X – 18) (St. Ex. 127).

DeSilva spoke with the anonymous caller on April 30 and May 1, 2013 (RR. X – 195, 201). In September 2014, the prosecutors gave DeSilva a CD with Blumenschein's recordings and said, "We want you to listen to a tape and see if you can recognize who this voice is." (RR. X – 243-244). They also told him that

it was a conversation was between Blumenschein and the appellant (RR. X – 244). DeSilva stated that the "pitch sounded the same, the cadence, the accent, it sounded like the same person I spoke with on the phone on those two occasions." (RR. X – 247). Thus, even if there were an impermissibly suggestive identification procedure, the substantial corroborating evidence assured that it did not give rise to a substantial likelihood of irreparable misidentification. The indicia of reliability outweighed any influence of an impermissibly suggestive pretrial identification. The trial court did not abuse its discretion in admitting the identification into evidence, and the appellant's fourth point of error should be overruled.

**B.    The appellant was not harmed by the admission of her voice identification because other evidence linked her to the GlaxoSmithKline investigation, and that investigation related to a collateral issue in the case.**

Even if this Court believes that due process was violated, this Court should still affirm the conviction if it determines "beyond a reasonable doubt that the error did not contribute to the conviction or punishment." TEX. R. APP. P. 44.2(a); *see Wall v. State*, 184 S.W.3d 730, 746 (Tex. Crim. App. 2006). Under Rule 44.2(a), this Court must "calculate, as nearly as possible, the probable impact of the error on the jury in light of the other evidence." *McCarthy v. State*, 65 S.W.3d 47, 55 (Tex. Crim. App. 2001); *Wesbrook v. State*, 29 S.W.3d 103, 119 (Tex. Crim. App. 2000). If there is a reasonable likelihood that the error materially affected the

54

jury's deliberations, then the error is not harmless beyond a reasonable doubt. *Wall*, 184 S.W.3d at 746. A finding of harmless error means that the nature of that evidence is such that it could not have affected the jury's deliberations or verdict. *Id.* The presence of other overwhelming evidence that was properly admitted which supports the material fact to which the inadmissible evidence was directed may be an important factor in the evaluation of harm. *Id.*

In the present case, the evidence supporting the appellant's guilt was overwhelming, even without the admission of DeSilva's identification of the appellant as the GlaxoSmithKline caller. As stated previously, there was evidence from numerous sources that Blumenschein and the appellant were intimate with each other, that the appellant would frequently give him expensive gifts, that she offered to have his child, that she named him in her will, and that they took frequent trips together, sometimes sharing a hotel room (RR. VII – 299-301) (RR. IX – 162-169, 176-179) (RR. X – 12-13, 26, 274-275) (RR. XI – 79). Furthermore, the appellant admitted to the affair on more than one occasion (RR. XII – 54) (RR. XI – 83). And she admitted to a friend that she would get in trouble for the poisoning because she gave Blumenschein the sweet coffee the day he became ill and because she had access to ethylene glycol in her lab (RR. XII – 71).

Moreover, the GlaxoSmithKline investigation was at best a tangential issue in the case. The only fact it established was that the appellant was instigating an

investigation into the possible conflict of interest between Blumenschein and Toney as well as Toney's dishonesty in submitting the appellant's fraudulent doctor's note. But that fact was already well established by other evidence showing that the appellant likely dropped off a letter with similar content to MD Anderson's conflict-of-interest chair (RR. VII – 266-268, 289-291) (RR. VIII – 277-284) (RR. X – 142-143). It was also established by other evidence that she sent an email probing into such matter to MD Anderson regulators (St. Ex. 143). Moreover, the appellant made herself available as an enthusiastic resource to both MD Anderson and GlaxoSmithKline in their investigations of the situation (RR. VI – 47-50) (RR. VII – 197-198, 265-266) (RR. X – 145-147, 154) (St. Ex. 137). Thus, it could not come as a surprise that the appellant was connected to yet another attempt to expose the alleged conflict.

Even if DeSilva's identification were the only evidence connecting the appellant to the investigation of the possible conflict of interest between Blumenschein and Toney, that issue was fairly irrelevant to the case. It did not address any element of the alleged offense (CR – 23). And it did not dispel any motive to attempt to kill Blumenschein. At most, it showed that the appellant was obsessed with Blumenschein, but that fact had already been established by other evidence in the case. The jury sent out three notes during their deliberations on guilt, but none dealt with the GlaxoSmithKline investigation (CR – 126, 127, 139).

And their guilt-stage deliberations lasted only four hours despite the fact that they heard from approximately twenty-two guilt-stage witnesses over the course of eight days of trial testimony (CR – 206-207). Neither prosecutor specifically mentioned the anonymous calls to GlaxoSmithKline in their closing argument (RR. XII – 103-120, 174-202). Thus, it is unlikely that DeSilva's identification materially affected the jury's deliberations. The appellant's fourth point of error lacks merit and should be overruled.

## CONCLUSION

It is respectfully submitted that all things are regular and the conviction should be affirmed.

> **DEVON ANDERSON**
> District Attorney
> Harris County, Texas
>
> /s/  Eric Kugler
> **ERIC KUGLER**
> Assistant District Attorney
> Harris County, Texas
> 1201 Franklin, Suite 600
> Houston, Texas  77002-1923
> (713) 755-5826
> kugler_eric@dao.hctx.net
> TBC No. 796910

## CERTIFICATE OF SERVICE AND COMPLIANCE

This is to certify that: (a) the word count function of the computer program used to prepare this document reports that there are 13,765 words in the relevant sections; and (b) a copy of the foregoing instrument will be served by efile.txcourts.gov to:

Barbara Drumheller
Attorney at Law
8501 Katy Freeway, Suite 201
Houston, Texas  77024
Barbara Drumheller@gmail.com
☐

/s/  Eric Kugler
**ERIC KUGLER**
Assistant District Attorney
Harris County, Texas
1201 Franklin, Suite 600
Houston, Texas  77002-1923
(713) 755-5826
TBC No. 796910

Date:  October 14, 2015